# EXHIBIT A
# TO DEFENDANTS' PRE-MOTION CONFERENCE LETTER

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7150**

WRITER'S EMAIL ADDRESS
**michaelcarlinsky@quinnemanuel.com**

November 26, 2024

<u>VIA E-MAIL</u>

John A. Piskora
David A. Forrest
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

Re:     *SDN Limited v. IOV Labs Limited*, Case No. 2:24-cv-06089

Counsel:

As you know, we represent Defendant Rootstock Labs Limited ("Rootstock," current name for IOV Labs Limited, RIF Labs Limited) and RSK Labs Limited ("RSK") in the above-captioned action.  We write pursuant to Federal Rule of Civil Procedure 11(c)(2) to give Plaintiffs Steven Nerayoff and SDN Limited and their counsel, Loeb & Loeb LLP, notice that Plaintiffs' Complaint is replete with demonstrably false information, which appears designed to manufacture jurisdiction in the United States District Court for the Eastern District of New York.  In the event Plaintiffs do not withdraw the Complaint within 21 days of this letter, Defendants intend to move for sanctions pursuant to Federal Rule of Civil Procedure 11.

Among the many false statements in the Complaint, the most significant is Plaintiffs' assertion that on June 19, 2018, Nerayoff "personally purchased 2,800,000 RIF tokens directly from IOV, transferring 200 Bitcoin to a digital wallet controlled by IOV."  Compl. ¶ 28(d).  As you know, Nerayoff set up SDN Limited in order to be able to participate in the token generation event because Rootstock refused to transact with U.S. persons.  As Nerayoff told Rootstock in February 2018:  "To alleviate any regulatory concerns there wouldn't be any US investors as all the contributions would be from a foreign entity.  I already allocated to very strategic investors such as ethereum cofounders etc and put 1150 BTC into a cayman entity in anticipation if that helps."  Ex. A (February 11, 2018 Email).  Nerayoff did not stop there—he also transferred his interests in SDN Limited to Yury Smolyar on March 1, 2018, so that Nerayoff, a U.S. person, would not be the beneficial owner of SDN Limited, permitting it to transact with Rootstock.  Ex. B (May 23, 2018 Letter).  It was only after Rootstock was assured of SDN Limited's absence of connections to the United States that Rootstock agreed to complete an Early Contribution Agreement with SDN Limited, which shows that Rootstock's sale of 2,800,000 RIF tokens for 200

**quinn emanuel urquhart & sullivan, llp**

ABU DHABI | ATLANTA | AUSTIN | BEIJING | BERLIN | BOSTON | BRUSSELS | CHICAGO | DALLAS | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM | MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI | SILICON VALLEY | SINGAPORE | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | WILMINGTON | ZURICH

Bitcoin was to SDN Limited, rather than Nerayoff personally. Ex. C (Early Contribution Agreement). Plaintiffs allegations in the Complaint are also false insofar as they suggest that Nerayoff was the owner of or an agent of SDN Limited throughout the entire relevant period—unless of course, Nerayoff and SDN Limited fraudulently induced Rootstock to enter into a transaction with SDN Limited by falsely representing that Nerayoff had divested of his interests and false representing that SDN Limited was not a U.S. Person. *See* Ex. C at Sch. 2 ¶ 15.

Plaintiffs' efforts to side-step the ECA are all the more surprising in light of the fact that: (1) in addition to including an arbitration agreement, the ECA explicitly draws contributors' attention to the fact that they are agreeing to an arbitration agreement in the introduction, Ex. C at 6; (2) it is simply not credible that Plaintiffs did not review the ECA prior to filing the Complaint given that Plaintiffs' Complaint challenges provisions of the ECA, *compare* Compl. ¶ 34 ("[C]ontrary to Defendants' representations that the funds raised by the RIF token sale would be used exclusively for the promotion and development of the RIF operating system protocol . . ."), *with* ECA at 4 ("[Rootstock] shall be conducting a [Token Sale] for the purpose of raising capital that it will deploy on researching, developing, and promoting the RIFOS Protocols . . .); (3) the ECA formed the basis for Defendants' removal (which Plaintiffs did not challenge); and (4) in our prior correspondence, we asked you to explain the basis on which Plaintiffs contended the lawsuit did not violate the arbitration agreement.

In addition to the false statements above, Plaintiffs' Complaint falsely asserts that SDN Limited purchased RIF Tokens from third parties in May and June 2018, Compl. ¶ 28, prior to the token generation event. As you know, RIF Tokens were not generated until November 9, 2018, months after SDN Limited's purported acquisition of tokens from unnamed third parties. Thus, there were no RIF Tokens in circulation in May and June 2018 that SDN could have purchased from any third parties.

Finally, Plaintiffs' Complaint falsely asserts that the "RIF blockchain was launched on the Ethereum network" rather than as a Bitcoin sidechain. Compl. ¶ 32. While lack of familiarity with the technology may be excusable for a layperson, Nerayoff is a founder of Ethereum and a sophisticated cryptocurrency investor, making it highly improbable that Nerayoff misunderstood the technology, which was released as a Bitcoin sidechain. At a minimum, given his sophistication, Nerayoff could have discovered based on a reasonable inquiry that the RSK blockchain was initially released as a Bitcoin sidechain, and only added *additional* Ethereum network compatibility later on.

The falsity of Plaintiffs' allegations are information that Plaintiffs and counsel knew, or that counsel would have discovered based on a reasonable inquiry before filing the Complaint in this action. Accordingly, Plaintiffs' false allegations are sanctionable under Rule 11(b)(3). *See, e.g., Leptha Enterprises, Inc. v. Longenback*, 1991 WL 183373, at *4 (S.D.N.Y. Sept. 9, 1991) (awarding sanctions against counsel); *China AI Cap. Ltd. on behalf of Link Motion Inc. v. DLA Piper LLP (US)*, 2024 WL 964596, at *6 (S.D.N.Y. Mar. 6, 2024) (awarding sanctions against counsel for making false allegations in Complaint).

Accordingly, pursuant to Rule 11(c)(2), Defendants hereby serve the enclosed Notice of Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 on Plaintiffs and their

counsel.  In accordance with that rule, in the event Plaintiffs do not withdraw their Complaint within 21 days of this letter, Defendants intend to seek sanctions against Plaintiffs and their counsel, including reimbursement of their attorney's fees and costs in moving to dismiss this action and in bringing their motion for sanctions.  *See* Fed. R. Civ. P. 11(c)(4); *see also, e.g.*, *Demaree v. Castro*, 2023 WL 6465881, at *16 (S.D.N.Y. Oct. 4, 2023) (granting sanctions against counsel for asserting "frivolous claims" and awarding attorneys' fees); *Eastway Const. Corp.*, 821 F.2d 121, 123 (2d Cir. 1987) (awarding attorneys' fees).

Defendants reserve all rights.


Sincerely,


Michael B. Carlinsky

# Exhibit A

**Mario Gazzola**

| | |
|---|---|
| **From:** | Steven Nerayoff <steven@alchemist.com> |
| **Sent:** | Sunday, February 11, 2018 11:58 AM |
| **To:** | Ariel Muslera |
| **Cc:** | Jacob Farber; Diego Gutierrez Zaldivar; Amit Shafrir; Jeff Pulver |
| **Subject:** | Re: Checking in |

Thank you Ariel for the email and I totally understand where you are coming from given all you have on your plate.

We are committed to working together on a long term partnership so a little delay isn't the end of the world. We will get the partnership to a place where everyone feels comfortable and is in the best interests of evangelizing RSK and getting projects onboarded!

To alleviate any regulatory concerns there wouldn't be any US investors as all the contributions would be from a foreign entity. I already allocated to very strategic investors such as ethereum cofounders etc and put 1150 BTC into a cayman entity in anticipation if that helps. And everyone's long terms interests obviously would be aligned.

Further that talk I arranged with Bob, Matt and Diego was beyond productive and I have proposed forming a smart contracts alliance that was Diego's idea and unlike others outside of the foundation who Diego spoke to the foundation is very open to doing! I am happy to be the bridge between Ethereum and RSK to get cooperation between the two which I believe is now possible and they have asked me to help restructure the foundation which would only help RSK and we should discuss this in more detail before I commit to anything as RSK is our first priority.

We would be completely open to having a conference in the meantime that we put on and can start planning when you have bandwidth to discuss.

And please remember how many token sales we have done so lean on us for anything you need. Otherwise we will wait to hear from you and know we look towards making RSK the best it can be for years to come.

PS. In addition to smarterbitcoin.com I just realized I own bitcoinsmartcontracts.com! Lol 

Sent from my iPhone. Apologies for misunderstandings or typos due to the spell checker.

On Feb 11, 2018, at 9:55 AM, Ariel Muslera <arielmuslera@rsk.co> wrote:

> Hi Steven,
>
> How are you? We've been quiet the last few weeks because we are heads down trying to get the pre-sale going, and also looking at the regulatory environment as it is getting more challenging by the minute and our priority is to ensure that things go smooth during and after the token sale is over. We've been spending some time with our counsel (both in Gibraltar and US) to figure out implications, risks, etc. of dealing with US investors at all. At the moment, we are still exploring a few options that might allow us to do it properly, but we haven't come to a final decision.
>
> As you can imagine, we've been quite busy with all this, and as a result, we have not been able to spend time defining the overall strategy related to long term partners and specifically in your proposal
>
> Given the timing of all this, and given that it is our priority to get the token sale going, we feel the need to postpone our partnership discussion after the token sale is done. Although in general we feel we can

get to an agreement, we also think there are things we'd need to work out and modify for both parties to be ok with the agreement (for example, understanding the involvement and roles of each individual in the different deliverables, as well as some aspects of the overall agreement like incentives, scope, etc.), and we just don't have enough bandwidth at the moment to focus on that as we should to be able to sign a contract.

In the meantime, we do want to see how you can still contribute to IOV as an investor with a number we all feel comfortable, but as I mentioned our concern is to ensure that we are 100% compliant with regulations. I am working on this in the coming week or so, and I hope to have more clarity on how (and if) we will take US investors, and how much we will be able to raise. I am sorry I can't be more specific, but as you probably know, the less detail the better in the current environment.

I understand this might not be the answer you are expecting, but I want to assure you that we do want to find ways to work together with you, Jeff, Amit and Jacob, it's just that there are a lot of moving parts right now and we need to focus on the most important aspect at the moment which is to launch and finalize the pre-sale.

Thanks for your patience!

Ariel

On Feb 9, 2018, at 3:38 PM, Steven Nerayoff <steven@alchemist.com> wrote:

Hey guys!

Are you available for a quick call today?  Are we still on with everything in the term sheet?

Best,

Steven

**From:** Jacob Farber <jacob@alchemist.com>
**Date:** Tuesday, February 6, 2018 at 12:33 PM
**To:** Ariel Muslera <arielmuslera@rsk.co>, Diego Gutierrez Zaldivar <dgz@rootstock.io>
**Cc:** Steven Nerayoff <steven@alchemist.com>, Amit Shafrir <amit@alchemist.com>, Jeff Pulver <jeff@alchemist.com>
**Subject:** Checking in

Hi Ariel and Diego,

I just wanted to check in and see if you have any thoughts on the revised proposal we sent over.

Happy to get on a call if that would be helpful.

Best,
Jacob

# Exhibit B

# M F
### TAX GROUP

8409 N. Military Trail,

Suite 119

Palm Beach Gardens, FL 33410

Tel: 561.691.1100
Fax: 561.626.3040

Office@MFTaxGroup.com
MFTaxGroup.com

May 23, 2018

To Whom It May Concern:
This letter is to confirm that on March 1, 2018 all beneficial rights for SDN, LTD have all been transferred from Steven Nerayoff to Yury Smolyar.

Please contact me if you have any additional questions at 561-691-1100.

Sincerely,

Mariela Arroyo, MST
Managing Partner

# Exhibit C



# EARLY CONTRIBUTION AGREEMENT

# RELATING TO RIF LABS LIMITED'S TOKEN SALE



**CONTENTS**

| | Page |
|---|---|
| **AGREEMENT DETAILS** | **4** |
| Introduction and Background | **4** |
| RIFOS Protocols and Platforms | **4** |
| Parties to this Agreement | **4** |
| Definitions and Interpretations | **5** |
| Basis of the Agreement | **5** |
| Formation of the Agreement | **5** |
| Scope of this Agreement | **6** |
| Note to Contributor | **6** |
| Prohibited Jurisdictions | **6** |
| Disclaimers | **7** |
| **GENERAL EARLY CONTRIBUTION TERMS AND CONDITIONS** | **8** |
| 1. RIF Price and Bonus Issue | **8** |
| 2. Right to Request Information | **10** |
| 3. Method of Contribution | **11** |
| 4. Overall description of the Smart Contract System | **13** |
| 5. ITA Wallet Creation, RIF Redemption Process & Issuance | **14** |
| 6. Refunds, Refusals, Suspension and Termination of Contributions | **16** |
| 7. Token Functionality | **17** |
| 8. Contributor's Representations and Warranties | **17** |
| 9. Risks | **18** |
| 10. Audit of the Smart Contract System | **18** |
| 11. Security | **18** |
| 12. Intellectual Property | **18** |
| 13. Indemnity | **19** |
| 14. Exclusion of Representations and Warranties | **19** |
| 15. Limitation of Liability | **20** |
| 16. Taxation | **20** |
| 17. Data Protection | **21** |



| | |
|---|---|
| 18. Dispute Resolution by Arbitration | **22** |
| 19. Confidential Information | **24** |
| 20. Force Majeure | **24** |
| 21. Notices | **25** |
| 22. Miscellaneous | **25** |
| **SCHEDULES** | |
| Schedule 1. Intended Functionality of RIF on the RIFOS Protocols | **2727** |
| Schedule 2. Contributor's Representations and Warranties | **2828** |
| Schedule 3. Risk Factors | **30** |
| Schedule 4. Definitions and Interpretations | **35** |
| **CONTRIBUTION FORM** | **40** |

DocuSign Envelope ID: 40C6BE3E-8A84-49A2-9E8D-EE7FC68DEFFA



**AGREEMENT DETAILS**

**INTRODUCTION AND BACKGROUND**

RIF LABS Limited (the "**Company**") shall be conducting a smart contract based private contribution campaign ("**Token Sale**") for the purpose of raising capital that it will deploy on researching, developing and promoting the RIFOS Protocols (as defined below) and to meet various other operating expenses relating to such activities.

In return for a contribution to the Company during the Token Sale, Contributors shall receive a cryptographic RIF token ("**RIF**") issued by the Smart Contract System (as such term is defined in clause 4.1 of the General T&Cs).

This Early Contribution Agreement ("**Agreement**") sets out the terms and conditions on which the Company agrees to accept, and you agree to make a contribution for the purchase of RIF.

**RIFOS PROTOCOLS & PLATFORMS**

The Company is proposing to develop a set of protocols (the "**RSK Infrastructure Framework Open Standard Protocols**" or "**RIFOS Protocols**") containing a number of built-in rules and application programming interfaces ("**APIs**") that relate to various core decentralized infrastructure services for (but not limited to) smart contract capabilities, scalable and high-speed payment processing, unified naming and directory services, encrypted data storage and secure communications ("**RIFOS Services**"), all of which are aimed at enabling developers create distributed applications ("**dApps**") integrated into the Bitcoin ecosystem. The RIFOS Services shall be built, run and operated on top of the RSK side-chain protocol (the "**RSK Smart Protocol**"), which is itself a smart contract blockchain built as a sidechain to the Bitcoin blockchain.

Amongst other things, the RSK Smart Protocol: (i) is a leading, fully functional, open source platform that brings Turing-complete smart contract and business logic execution capabilities to the Bitcoin network; and (ii) aims at solving the scalability issues for transaction processing currently affecting the Bitcoin blockchain by being able to process several hundreds of transactions per second it its current state, and working on building this up to several thousand transactions per second in the future.

The RIFOS Protocols are intended to be an evolution of the RSK Smart Protocol, designed as a multi-layered service stack, consisting of infrastructure service protocols combined with a set of development libraries and standard APIs, enabling traditional and blockchain developers to easily integrate and use decentralized infrastructure in their applications. These open source protocols, which shall also allow the seamless integration of third party infrastructure services, are envisaged to help promote the creation of the next generation of dApps and drive the mass market adoption of open and decentralized blockchain technologies.

For a more detailed description of the RSK Smart Protocol, the proposed RIFOS Protocols and the Company's intended development activities, please refer to:

a)      the RSK Smart Protocol's website at https://www.rsk.co/ (the "**RSK Website**"); and

b)      the Company's whitepaper, a copy of which shall be sent to you by email (the "**Whitepaper**"),

together referred to as the "**Project Documentation**". The information contained in the Project Documentation is of a descriptive nature only, is not binding and does not form part of this Agreement.

**PARTIES TO THIS AGREEMENT**

4

DocuSign Envelope ID: 40C6BE3E-8A84-49A2-9FBD-EE7FC68DEFFA



RIF LABS Limited is a company incorporated and registered in Gibraltar with registration number 116697 and shall be the creator and issuer of RIF under this Agreement. References in this Agreement to "**Company**", "**we**", "**our**" or "**us**" are to RIF LABS Limited and its respective successors in interests and assigns."

References in this Agreement to "**Contributor**", "**your**" or "**you**" are to the person/entity named on the Contribution Form that accepts this Agreement and makes a contribution to the Company for the purchase of RIF as set out in and on the terms of this Agreement.

You and the Company shall together be referred to as the "**Parties**" and references to a "**Party**" shall be to the relevant one of them as the context requires.

Please note that although you are entering into this Agreement with RIF LABS Limited, there may be other entities within the RIF group from time to time ("**RIF Entities**") that will develop, manage, promote, and/or operate the RIFOS Protocols and related platforms or parts thereof.

If you have any questions relating to this Agreement, please contact us at [contributors@rifbyrsk.org](mailto:contributors@rifbyrsk.org).

**DEFINITIONS & INTERPRETATIONS**

The definitions and rules of interpretation set out in Schedule 4 apply in this Agreement (including, for the avoidance of doubt, the Agreement Details, the Contribution Form, the General T&Cs and the Schedules).

**BASIS OF THE AGREEMENT**

This Agreement is made up of the following documents:

(A)      the Agreement Details;

(B)      the Contribution Form;

(C)      the General Early Contribution Terms and Conditions ("**General T&Cs**"); and

(D)      the Schedules.

If there is any conflict or inconsistency between the terms of the documents listed above, a term contained in a document higher in the list shall have priority over one contained in a document lower in the list.

**FORMATION OF THE AGREEMENT**

Any person, who wishes to enter into this Agreement with the Company for the purposes of making a contribution for the purchase of RIF ("**Prospective Contributor**"), shall first be required to complete and sign the Contribution Form and send this to the Company by email. Following the Company's receipt of the signed and completed Contribution Form, the Company shall send an email to the Prospective Contributor with instructions ("**Contribution Instructions**") setting out how to transfer the Proposed Contribution Amount (as defined in the Contribution Form) to the Company, including details of the Company's Bitcoin or Ethereum wallet address (as applicable) to which the Proposed Contribution Amount must be sent. Further details relating to the method and terms of contribution are set out in Clause 3 of the General T&Cs.

The completion and signing of the Contribution Form, together with the transfer to the Company of the Proposed Contribution Amount by a Prospective Contributor constitutes an offer to make a contribution to the Company for the purchase of RIF in accordance with this Agreement (the "**Contribution Offer**").



By signing the Contribution Form, you expressly acknowledge that you have read, understood and accept all of the terms set out in this Agreement and that you are willing to enter into a legally binding contract with the Company on such terms.

The Contribution Offer shall only be deemed to be accepted, and consequently the Agreement deemed to have been entered into, when the Company countersigns and dates the Contribution Form and sends a copy of the duly executed Contribution Form to the Contributor by email. The Contributor's receipt of the Company's duly executed Contribution Form shall constitute the Company's acceptance of the Contribution Offer and the formation of a valid and legally binding contract between the Parties on the terms of this Agreement for the purchase of RIF.

The Company shall be free to accept or refuse any Contribution Offer received in its sole and absolute discretion. If for whatever reason, the Company refuses or rejects the Contribution Offer, the Company shall procure that the Proposed Contribution Amount is returned to the Prospective Contributor in accordance with terms set out in clause 6.1 of the General T&Cs.

**SCOPE OF THE AGREEMENT**

Save as otherwise set out in this Agreement, this Agreement (including any terms incorporated herein by reference) governs only your contribution to the Company for the purchase of RIF.

Any potential future use of RIF in relation to the RIFOS Protocols shall be subject to and governed by such other applicable terms, conditions and policies ("**RIFOS Service Terms**") relating to the use of RIFOS Services and/or dApps implemented and made available on the RIFOS Protocols by the Company, a RIF Entity and/or third-party service providers ("**RIF Service Providers**"). The RIFOS Service Terms shall be made available to users, if and when the RIFOS Services and/or dApps are successfully developed, deployed and operational on the RIFOS Protocols by RIF Service Providers.

**NOTE TO CONTRIBUTOR**

Please read this Agreement carefully. By making a contribution to the Company for the purchase of RIF, you will be legally bound by this Agreement and all terms incorporated herein by reference.

This Agreement contains provisions, which affect your legal rights. Note that clause 18 of the General T&Cs contains a binding arbitration clause.

If you do not agree to any of the terms set out in this Agreement, you believe that any terms should not apply to you, or you wish to negotiate any terms, do not take any steps to enter into this Agreement or otherwise make a contribution to the Company for the purchase of RIF.

If you are in any doubt as to the action you should take, you should consult your legal, financial, tax or other professional advisor(s).

**PROHIBITED JURISDICTIONS**

Due to legal and regulatory uncertainty in the Prohibited Jurisdictions, citizens and green card holders of and persons residing in any of the Prohibited Jurisdictions are prohibited from making contributions to the Company under the terms of this Agreement. It is your responsibility to check that entering into this Agreement and making a contribution to the Company for the purchase of RIF is not unlawful or prohibited under the laws of the jurisdiction in which you are resident or established, or under the laws of any other jurisdiction to which you may be subject. Persons from any of the Prohibited Jurisdictions that provide false or inaccurate information about their citizenship, residency and/or nationality shall be in breach of this Agreement and shall be required

6



to indemnify the Company in respect of any damages and/or losses suffered due to this breach in accordance with the indemnification provisions set out in this Agreement.

**DISCLAIMERS**

Neither this Agreement nor the Project Documentation constitute a prospectus or offering document, and are not an offer to sell, nor the solicitation of an offer to buy any investment or financial instrument in any jurisdiction. RIF should not be acquired for speculative or investment purposes with the expectation of making a profit on immediate or future re-sale.

No regulatory authority has examined or approved any of the information set out in this Agreement and/or the Project Documentation. No such action has been or will be taken under the laws, regulatory requirements or rules of any jurisdiction. The publication, distribution or dissemination of this Agreement and/or the Project Documentation does not imply that applicable laws, regulatory requirements or rules have been complied with.

DocuSign Envelope ID: 40C6BE3E-8484-49A2-9E8D-EE7FC8BDEFFA



**GENERAL EARLY CONTRIBUTION TERMS AND CONDITIONS**

**("GENERAL T&Cs")**

**Last updated: May 11, 2018**

**1.      RIF Price and Bonus Issue**

1.1      The RIF base price shall be 1 Bitcoin = 14,000 RIF (the "**Base Price**"). In order to calculate the initial amount of RIF to be issued to the Contributor (exclusive of any Lock-in Bonuses to which the Contributor may become entitled) ("**Initial RIF Allocation**"), the Company shall:

a)        in the event that a contribution is made in Bitcoin ("**Bitcoin Contribution**"), divide the Bitcoin Contribution by the Base Price; or

b)        in the event that a contribution is made in Ether pursuant to clause 3.5 ("**Ether Contribution**"), calculate the Bitcoin equivalent of the Ether Contribution using the method described in clause 1.2 and subsequently divide the Bitcoin equivalent of the Ether Contribution by the Base Price.

If the Company accepts the Contribution Offer, the Company shall specify the Initial RIF Allocation to which the Contributor is entitled in the signed and dated Contribution Form to be returned to the Contributor by the Company accepting the Contribution Offer.

1.2      In order to calculate the Bitcoin equivalent of any Ether Contribution, the Company shall:

a)        calculate the 24 hour volume weighted average price ("**VWAP**") for Bitcoin/Ether transactions executed on the Bitstamp Exchange (https://www.bitstamp.net/) during the 24 hour period that ends at 13:00 GMT immediately prior to the Company's receipt of the Ether Contribution into the Company's Ethereum wallet; and

b)        divide the Ether Contribution by the VWAP.

For the purposes of this clause 1.2, Bitstamp's "**VWAP**" for a particular date and time period shall be calculated using the following formula:

$$VWAP = \frac{Total\ number\ of\ Bitcoin\ bought\ on\ Bitstamp\ x\ Price\ paid\ in\ Ether}{Total\ number\ of\ Bitcoin\ bought\ on\ Bitstamp}$$

The Company shall calculate the applicable VWAP at 13:00 GMT on each day of the Token Sale and shall publish the daily applicable VWAP on the Company's various communication channels.

1.3      **First Lock-in Bonus:** If the Contributor:

a)        prior to the expiry of three (3) months following the SCS Deployment Date ("**First Lock-in Period**"):

(i)        creates an ITA Wallet in accordance with clauses 5.1 and 5.2; and

8



    (ii)     procures the issue and delivery of the Initial RIF Allocation into the Contributor's ITA Wallet in accordance with the Redemption Process or Contingent Redemption Process described in clause 5; and

b)     continues to hold and store any amount of the Initial RIF Allocation in the Contributor's ITA Wallet on conclusion of the First Lock-in Period,

the Contributor shall receive a bonus issue of RIF equivalent to 20% of the Initial RIF Allocation held in the Contributor's ITA Wallet on conclusion of the First Lock-in Period.

1.4     **Second Lock-in Bonus**: If the Contributor:

a)     prior to the expiry of six (6) months following the SCS Deployment Date ("**Second Lock-in Period**"):

    (i)     creates an ITA Wallet in accordance with clauses 5.1 and 5.2; and

    (ii)     procures the issue and delivery of the Initial RIF Allocation into the Contributor's ITA Wallet in accordance with the Redemption Process or Contingent Redemption Process described in clause 5; and

b)     continues to hold and store any amount of the Initial RIF Allocation in the Contributor's ITA Wallet on conclusion of the Second Lock-in Period,

the Contributor shall receive a bonus issue of RIF equivalent to 5% of the Initial RIF Allocation held in the Contributor's ITA Wallet on conclusion of the Second Lock-in Period.

1.5     **Third Lock-in Bonus**: If the Contributor:

a)     prior to the expiry of nine (9) months following the SCS Deployment Date ("**Third Lock-in Period**"):

    (i)     creates an ITA Wallet in accordance with clauses 5.1 and 5.2; and

    (ii)     procures the issue and delivery of the Initial RIF Allocation into the Contributor's ITA Wallet in accordance with the Redemption Process or Contingent Redemption Process described in clause 5; and

b)     continues to hold and store any amount of the Initial RIF Allocation in the Contributor's ITA Wallet on conclusion of the Third Lock-in Period,

the Contributor shall receive a bonus issue of RIF equivalent to 5% of the Initial RIF Allocation held in the Contributor's ITA Wallet on conclusion of the Third Lock-in Period.

1.6     If you fail to procure the issue and delivery of your Initial RIF Allocation to your ITA Wallet in accordance with the Redemption Process or Contingent Redemption Process described in clause 5 prior to the expiry of a Lock-in Period, you shall be deemed to have irrevocably waived and forever surrendered your right to receive the Lock-in Bonus applicable to such Lock-in Period and any preceding Lock-in

Period (if relevant) but you shall not be precluded from receiving the Lock-in Bonus applicable to any future Lock-in Period.

1.7    For the purposes of calculating any Lock-in Bonus, the Smart Contract System shall only have regard to the Initial RIF Allocation which continues to be stored and held in the Contributor's ITA Wallet at the end of the relevant Lock-In Period. The Smart Contract System shall not take into account any RIF not issued and delivered to the Contributor as part of the Initial RIF Allocation, including any RIF which may be:

a)    issued and delivered to the Contributor's ITA Wallet as a bonus;

b)    transferred to the Contributor's ITA Wallet by a third party; or

c)    acquired by the Contributor through other methods not set out in or contemplated by this Agreement.

1.8    For the avoidance of any doubt, the maximum aggregate bonus issue of RIF that a Contributor may be entitled to receive pursuant to the Lock-in Bonuses under this Agreement shall be thirty percent (30%) of the Initial RIF Allocation, provided that the Contributor:

a)    prior to the expiry of the First Lock-in Period:

(i)    creates an ITA Wallet in accordance with clauses 5.1and 5.2; and

(ii)    procures the issue and delivery of the Initial RIF Allocation into the Contributor's ITA Wallet in accordance with the Redemption Process or Contingent Redemption Process described in clause 5; and

b)    continues to store and hold the entirety of the Initial RIF Allocation in the Contributor's ITA Wallet until the conclusion of the Third Lock-in Period.

## 2.    Right to Request Information

2.1    Before you are able to make a contribution to the Company, you shall be required to undergo, and successfully complete, a contributor whitelisting process (the "**Whitelisting Process**"). The Company has engaged Coinfirm (https://www.coinfirm.io/), a specialist blockchain AML risk and compliance service provider, to carry out the Whitelisting Process and other administrative tasks in connection with the Company's acceptance of contributions and issue of RIF. Pursuant to the Whitelisting Process, you shall be required to provide certain information and documentation verifying your identity, address, source of wealth and such other matters as may be necessary for the Company to:

a)    comply with any "know your customer" or similar obligations to which we may be subject; and

b)    comply with any other applicable laws and regulations in connection with the creation and issue of RIF to you.



2.2    You agree that you shall, promptly upon either the Company's or Coinfirm's request, supply such information and documentation as may be reasonably requested pursuant to the Whitelisting Process in order to:

a)    carry out, to our satisfaction, all necessary "know your customer" and other similar checks which we may be obliged to perform; and

b)    ensure, to our satisfaction, that we have complied with all applicable laws and regulations in connection with the creation and issue of RIF to you as contemplated by this Agreement.

2.3    You acknowledge and accept that we may refuse or reject any contributions for the purchase of RIF until:

a)    you have successfully completed the Whitelisting Process;

b)    you have provided all information and documentation that may be requested under this clause 2; and

c)    we have determined that it is permissible to create and issue RIF to you under applicable law.

**3.    Method of Contribution**

3.1    The Contributor shall make a contribution to the Company either in Bitcoin or Ether in the manner described in this clause 3.

3.2    Without prejudice to the remaining provisions of this Clause 3, the Company shall, as soon as reasonably practicable following the receipt of the signed and completed Contribution Form (as described in the "Formation of the Agreement" section of the Agreement Details), send an email to the Prospective Contributor with the Contribution Instructions.

3.3    The Proposed Contribution Amount must be received by the Company within five (5) Business Days following the date on which the Company sends the Prospective Contributor the Contribution Instructions by email (as further described in the Agreement Details) (the "**Contribution Period**")**.** The Proposed Contribution Amount shall be deemed received by the Company when the transaction has been processed, confirmed and settled on the Bitcoin or Ethereum blockchain (as applicable). If the Proposed Contribution Amount is not received by the Company prior to the expiry of the Contribution Period, the Company cannot guarantee the allocation of RIF to the Prospective Contributor and we reserve the right to reject the Contribution Offer and return the Proposed Contribution Amount to the Prospective Contributor in accordance with clause 6.1.

3.4    **Contributions to be made in Bitcoin shall be sent from one of the following Bitcoin wallets in respect of which you have access to and control of your private key:** Trezor One, Ledger Nano S or Bitcoin Core ("**BTC Compatible Wallets**"). You shall be required to verify your Bitcoin Contribution in order to enable the Company to issue and deliver RIF to you through the Smart Contract System (as further described in clause 5). Using one of the BTC Compatible Wallets to sign the Redemption Message is the only way to verify your Bitcoin Contribution and procure the issue and delivery of the Initial RIF Allocation to your ITA Wallet in accordance with clause 5.

DocuSign Envelope ID: 40C6BE3E-8484-49A2-9EBD-EE7FC08DEFEA



3.5    **Contributions to be made in Ether shall be sent from one of the following Ethereum wallets in respect of which you have access to and control of your private key:** Trezor One, Ledger Nano S or MyEtherWallet ("**ETH Compatible Wallets**"). The hardware wallets (i.e. Trezor One and Ledger Nano S) must be used in conjunction with MyEtherWallet. You shall be required to verify your Ether Contribution in order to enable the Company to issue and deliver RIF to you through the Smart Contract System (as further described in clause 5). Using one of the ETH Compatible Wallets to sign the Redemption Message is the only way to verify your ETH Contribution and procure the issue and delivery of the Initial RIF Allocation to your ITA Wallet in accordance with clause 5.

3.6    **Contributions shall not, under any circumstances, be sent from any cryptocurrency wallet other than a BTC Compatible Wallet or ETH Compatible Wallet. Examples of incompatible wallets include (without limitation) cryptocurrency exchange wallets or any wallet in respect of which you do not have access to or control of your private key.**

3.7    The entire contribution must be sent as a single transaction from a BTC Compatible Wallet or ETH Compatible Wallet. Contributions must not be sent as multiple separate transactions or from more than one cryptocurrency wallet. The BTC Compatible Wallet or ETH Compatible Wallet (as the case may be) from which the contribution is sent shall be referred to as the Contributor's "**Source Wallet**".

3.8    The Contributor will bear all gas costs and other costs and fees (collectively, "**Contribution Costs**") with respect to transferring your contribution to the Company. You acknowledge and accept that the transfer of your contribution may be delayed, rejected, or otherwise not processed due to:

a)    the Contributor's failure to include a sufficient amount of Bitcoin or Ether as gas to cover the Contribution Costs for its transfer; and/or

b)    network congestion or fault, or other errors or malfunctions in processing the Contributor's transfer on the Bitcoin blockchain or Ethereum blockchain (as the case may be) which are outside of the Company's control.

3.9    Contributions shall be sent to the Company's Bitcoin wallet address or Ethereum wallet address (as applicable) notified to the Contributor by email in the Contribution Instructions and confirmed through other secure communication channels that we may determine acting in our sole and absolute discretion. Details of the Company's Bitcoin wallet address or Ethereum wallet address (as applicable) shall be provided to the Contributor following the successful completion of the Whitelisting Process described in clause 5 and satisfaction of such other conditions as the Company shall determine in its sole and absolute discretion.

3.10    To the extent that any third-party website, service provider, intermediary or smart-contract (other than Coinfirm) offers to receive contributions and issue RIF or facilitates the allocation or transfer of RIF in any way ("**Unaffiliated Third Parties**"), such Unaffiliated Third Parties are not authorised by the Company nor do they have any legal or commercial relationship in any way with the Company, the RIFOS Protocols, the RIFOS Services or RIF, unless expressly:

a)    set out in this Agreement; or

b)    notified to you by us in writing.

DocuSign Envelope ID: 40C6BE3E-8484-49A2-9EBD-EE7FC6BDEFFA



3.11    Contributors that send contributions:

a)        other than as described in this clause 3; or

b)        to any Unaffiliated Third Party,

risk losing their entire contribution and the Company shall not be responsible or liable for recovering or returning any such contributions to the Contributor, nor shall we be responsible or liable for any losses incurred by the Contributor in this respect.

3.12    On receipt of your contribution and after the Company sends back the signed and dated Contribution Form to you by email accepting the Contribution Offer, such contribution shall immediately become the sole and exclusive property of the Company who shall be entitled to apply the contribution towards the development of the RIFOS Protocols and other operating expenses relating to our business. We, acting in our sole and absolute discretion, shall determine the application of your contribution and we shall be under no obligation to inform you or otherwise verify how your contribution is used.

**4.      Overview of the Smart Contract System**

4.1     In consideration for the receipt of a contribution from the Contributor, the Company shall deploy and activate a set of smart contracts (the "**Smart Contract System**") on the RSK Smart Protocol for the purposes of creating, issuing and delivering RIF to the Contributor in accordance with the parameters coded into the Smart Contract System by the Company, as further described in this clause 4.

4.2     RIF to be created by the Company through the Smart Contract System shall be based on the ERC20 token standard and is intended to have the functionality set out in Schedule 1.

4.3     The SCS Deployment Date shall occur within nine (9) months following the conclusion of the Token Sale. The Token Sale shall be deemed to conclude once the aggregate sum of contributions received by the Company from all contributors is equivalent to or greater than 15000 BTC. The Company shall notify you by email of the date on which the Token Sale concludes. If for whatever reason, we are unable to deploy and activate the Smart Contract System within the timeframe specified in this clause 4.3, we shall exercise reasonable endeavours to procure that deployment and activation of the Smart Contract System shall occur within a reasonable time thereafter.

4.4     The Smart Contract System will monitor the balance of the Initial RIF Allocation stored and held in the Contributor's ITA Wallet at the end of each Lock-in Period. If the Contributor is entitled to a Lock-in Bonus, the issue and delivery of such Lock-in Bonus to the Contributor's ITA Wallet through the Smart Contract System shall occur autonomously no later than five (5) days following the expiry of the relevant Lock-in Period to which the Lock-in Bonus relates.

4.5     Once the Smart Contract System is deployed and activated on the RSK Smart Protocol, it shall run autonomously in accordance with the behaviour and operations coded into the Smart Contract System by the Company for the creation, issue and delivery of RIF and the Company shall not have the ability to alter, change or modify its behaviour or operations or otherwise to interrupt the creation, issue and delivery of RIF.

4.6     The Company's:

DocuSign Envelope ID: 40C6BE3F-3484-49A2-9EBD-EE7FC08DEFFA



(a)      deployment and activation of the Smart Contract System on the RSK Smart Protocol; and

(b)      if applicable, whitelisting of the ITA Wallet address for the purposes of the Contingent Redemption Process (as described in clauses 5.7 and 5.8 below),

shall constitute full and final performance of the Company's obligations to issue and deliver RIF to the Contributor under this Agreement.

**5.      ITA Wallet Creation, RIF Redemption Process & Issuance**

5.1      Without prejudice to any other provisions of this Agreement, in order to verify your contribution and enable the Company to issue and deliver RIF to you through the Smart Contract System, the Contributor shall:

(a)      create an initial token allocation wallet into which the Initial RIF Allocation shall be delivered ("**ITA Wallet**");

(b)      undertake and successfully complete the Redemption Process or Contingent Redemption Process described in this clause 5; and

(c)      comply with such other reasonable instructions and directions of the Company and/or the RIF Entities as may be notified to you in writing in relation to the issue and delivery of RIF to your ITA Wallet.

5.2      An ITA Wallet is a standard, open source cryptocurrency wallet that will be compatible with the receipt, storage and transfer of RIF. **Either the Company or one of the RIF Entities shall send you written notice following the Company's receipt of your contribution, but prior to the SCS Deployment Date, with detailed instructions together with wallet management tools to create, access, manage and identify your ITA Wallet.**

5.3      The Contributor's compliance with the conditions set out in clause 5.1 shall trigger a smart contract operation pursuant to which the Initial RIF Allocation shall be autonomously issued and delivered by the Smart Contract System to the Contributor's ITA Wallet.

5.4      To undertake and successfully complete the Redemption Process, the Contributor must have access to and control of the Contributor's Source Wallet, including any private key, seed words and/or other credentials necessary to access, and execute transactions from, the Contributor's Source Wallet. **If for whatever reason you are not able to access and control your Source Wallet, do not attempt to initiate, undertake and/or complete the Redemption Process.** In such circumstances, the Contributor shall be required to initiate the Contingent Redemption Process described in clauses 5.7 and 5.8 for the purposes of procuring the issue and delivery of the Initial RIF Allocation to the Contributor's ITA Wallet through the Smart Contract System.

5.5       To initiate the Redemption Process, the Contributor shall:



(a)     generate a cryptographic message using the Contributor's Source Wallet containing the Contributor's ITA Wallet address ("**Redemption Message**");

(b)     sign the Redemption Message using the Contributor's Source Wallet (if the Source Wallet is comprised of multiple input addresses, the first input address must be used to sign the Redemption Message; and

(c)     send the signed Redemption Message to the Smart Contract System.

**Further detailed information regarding how to generate, sign and send the Redemption Message to the Smart Contract System shall be notified to the Contributor in writing by either the Company or one of the RIF Entities prior to the SCS Deployment Date.**

5.6     The initiation and successful completion of the Redemption Process or Contingent Redemption Process (as described in clauses 5.7 and 5.8 below) shall be the sole and exclusive responsibility of the Contributor and under no circumstances shall the Company be responsible or liable for any losses (whether direct or indirect) incurred by the Contributor as a result of the Contributor's delay in initiating and/or successfully completing the Redemption Process or Contingent Redemption Process or the Contributor's failure to successfully complete the Redemption Process or Contingent Redemption Process in accordance with any directions or instructions notified to the Contributor by either the Company or any of the RIF Entities.

5.7     The Company will establish a secure, contingent redemption process ("**Contingent Redemption Process**") to enable the Contributor to procure the issue and delivery of the Initial RIF Allocation to the Contributor's ITA Wallet through the Smart Contract System, in the event that, following the Company's receipt of the Contributor's contribution, the Contributor is unable to access and control the Contributor's Source Wallet and is consequently unable to initiate and complete the Redemption Process.

5.8     The Contingent Redemption Process shall involve:

(a)     the Contributor generating a cryptographic message using the Contributor's Source Wallet containing the Contributor's ITA Wallet address and such other information as the Company or one of the RIF Entities shall notify to the Contributor in writing during the Agreement formation and contribution process ("**Delegation Message**");

(b)     the Contributor safely storing the Delegation Message; and

(c)     the Company whitelisting the address of the Contributor's ITA Wallet to enable you to verify your contribution and procure the issue and delivery of the Initial RIF Allocation to your ITA Wallet.

**Detailed instructions regarding how to generate, store and send the Delegation Message shall be notified to the Contributor in writing by either the Company or one of the RIF Entities during the Agreement formation and contribution process. It is imperative that you safely store your Delegation Message and do not transfer, transmit, give or grant access to the Delegation Message to any person or entity, as this may render it impossible for you to undertake and successfully complete the Contingent Redemption Process or to otherwise procure the issue and delivery of RIF Tokens as further set out in clause 5.10.**

15

DocuSign Envelope ID: 40C6BF3F-8484-49A2-9F8D-EE7FC6BDEFFA



5.9     To initiate the Contingent Redemption Process, you shall send written notice to the Company by email that you have been unable to initiate and/or successfully complete the Redemption Process together with the reasons why. Within a reasonable period of time following the Company's receipt of your written notification, either the Company or one of the RIF Entities shall contact you to provide detailed instructions regarding what actions need to be undertaken in relation to the Contingent Redemption Process. Following the Contributor's initiation of the Contingent Redemption Process, the Contributor's ability to procure the issue and delivery of the Initial RIF Allocation through the Redemption Process shall automatically cease.

5.10    **Please note that the Contributor's failure to generate and/or store the Delegation Message for the purposes of the Contingent Redemption Process may render it impossible to deliver the Initial RIF Allocation to the Contributor, either through the Smart Contract System or through the method described in Clause 5.11. Under no circumstances shall the Company be responsible or liable or any losses (whether direct or indirect) incurred by the Contributor as a result of the Contributor's failure to generate and/or store the Delegation Message for the purposes of the Contingent Redemption Period**

5.11    The Contributor shall initiate and successfully complete the Redemption Process or Contingent Redemption Process (as the case may be) no later than three hundred and sixty-five (365) days following the SCS Deployment Date (the "**Redemption Period**"). Following the expiry of the Redemption Period, any RIF remaining in the Smart Contract System (as a result of the Contributor's failure to procure the issue and delivery of the Initial RIF Allocation pursuant to the Redemption Process or Contingent Redemption Process), will be automatically transferred to the Company by the Smart Contract System, and the Contributor shall:

(a)     contact the Company in order to procure the issue and delivery of the Initial RIF Allocation to which the Contributor is entitled under this Agreement; and

(b)     not be entitled to any refund or reimbursement of your contribution,

and the Company shall not be liable or responsible for any losses (whether direct or indirect) which you may incur as a result of your failure to procure the issue and delivery of your Initial RIF Allocation prior to the expiry of the Redemption Period.

## 6.     Refunds, Refusals, Suspension and Termination of Contributions

6.1     The Company reserves the right to refuse or reject any Contribution Offers or any contributions made at any time in our sole and absolute discretion. To the extent that we refuse or reject a contribution, we will exercise reasonable endeavours to procure that the contribution is returned to the Contributor's Source Wallet. However, the Contributor acknowledges and accepts that due to:

a)      the Bitcoin blockchain's or Ethereum blockchain's transaction and/or mining fees; and/or

b)      administrative expenses incurred by the Company in returning the contribution,

you are unlikely to receive an amount equivalent to your contribution and that such refunded amount may be less than your contribution.



6.2     The Company may at any time either temporarily suspend or permanently cancel the Token Sale for whatever reason (acting in our sole and absolute discretion). Any suspension or cancellation of the Token Sale shall be deemed to commence from the moment that the Company sends you a notice of suspension or cancellation (as applicable) by email or we publish a statement to that effect on the Company's Token Sale communication channels. It is your responsibility to regularly monitor the Company's Token Sale communication channels for any such statements.

6.3     Except where the Company:

a)      decides to refuse or reject a Contribution Offer or any contribution under the terms of this Agreement;

b)      decides to cancel the Token Sale pursuant to clause 6.2; or

c)      is required to refund a contribution under applicable law,

all contributions received by the Company under this Agreement are final and Contributors shall not be entitled to claim any refund or reimbursement of contributions from us.

**7.      Token Functionality**

7.1     Ownership of RIF carries no rights, whether express or implied, other than a limited potential future right or expectation to use and interact with the RIFOS Services (as further described in Schedule 1 to this Agreement) if and to the extent that RIFOS Services are successfully developed and deployed. Any potential future right or expectation relating to the use of RIF shall be subject to any restrictions and limitations set out in this Agreement and/or the RIFOS Service Terms (as applicable).

7.2     You acknowledge and accept that RIF do not represent or constitute:

a)      any ownership right or stake, share, equity, security, commodity, bond, debt instrument or any other financial instrument or investment carrying equivalent rights;

b)      any right to receive future revenues, shares or any other form of participation or governance right from, in or relating to the Company and/or the RIFOS Protocols;

c)      any form of money or legal tender in any jurisdiction, nor do they constitute any representation of money (including electronic money); or

d)      the provision of any goods and/or services as at the date that this Agreement forms a binding agreement between the Parties.

7.3     Protections offered by applicable law in relation to the acquisition, storage, sale and/or transfer of the instruments and/or investments referred to in clause 7.2 shall not apply to any contribution made under this Agreement for the acquisition of RIF or to your storage, sale, use and/or transfer of RIF.

7.4     The Company makes no warranties or representations and offers no assurances (in each case whether express or implied) that RIF shall confer any actual and/or exercisable rights of use, functionality, features, purpose or attributes in connection with the RIFOS Protocols or the RIFOS Services.



**8. Contributor's Representations and Warranties**

By entering into the Agreement and sending a contribution to the Company, you hereby represent and warrant the matters set out in Schedule 2 to this Agreement.

**9. Risks**

You acknowledge and agree that sending a contribution to the Company, the creation and issue of RIF and the development and deployment of the RIFOS Protocols carries significant financial, regulatory and reputational risks, including but not limited to those set out in Schedule 3 to this Agreement.

**BY MAKING A CONTRIBUTION TO THE COMPANY AND ACCEPTING THIS AGREEMENT YOU EXPRESSLY ACKNOWLEDGE, ACCEPT AND ASSUME THE RISKS SET OUT IN SCHEDULE 3 TO THIS AGREEMENT.**

**10. Audit of the Smart Contract System**

10.1    The Company shall exercise reasonable endeavours to have the Smart Contract System audited and approved by technical experts with regard to both accuracy and security of the underlying code.

10.2    Notwithstanding clause 10.1, smart contract technology is still in an early stage of development and its application is currently of an experimental nature, which carries significant operational, technological, financial, regulatory and reputational risks. Accordingly, while any audit conducted shall raise the level of security and accuracy of the Smart Contract System, you acknowledge, understand and accept that the audit does not amount to any form of warranty, representation or assurance (in each case whether express or implied) that the Smart Contract System and/or RIF are fit for a particular purpose or that they are free from any defects, weaknesses, vulnerabilities, viruses or bugs which could cause, inter alia, the complete loss of your contribution and/or RIF.

**11. Security**

You are responsible for implementing all reasonable and appropriate measures for securing the wallet, vault or other storage mechanism you use to send a contribution to the Company and to receive and store RIF that are issued to you by the Smart Contract System, including any requisite private key(s), seed words or other credentials necessary to access such storage mechanism(s). If your private key(s) or other access credentials are lost, you may lose access to your RIF. The Company shall not be responsible for any security measures relating to your receipt, possession, storage, transfer or potential future use of RIF nor shall we be under any obligation to recover or return any RIF and we hereby exclude (to the fullest extent permitted under applicable law) any and all liability for any security breaches or other acts or omissions which result in your loss of (including your loss of access to) RIF issued to you under this Agreement.

**12. Intellectual Property**

12.1    In this clause 12, "**Company's IP Rights**" means in relation to RIF, the Company, the Token Sale, the RIFOS Protocols and the Project Documentation, all:

DocuSign Envelope ID: 40C6BE35-8484-49A2-9EBD-EE7FC06DEEFA



a)      patents, inventions, designs, copyright and related rights, database rights, knowhow and confidential information, trademarks and related goodwill, trade names (whether registered or unregistered), and rights to apply for registration;

b)      all other rights of a similar nature or having an equivalent effect anywhere in the world which currently exist or are recognised in the future; and

c)      all applications, extensions and renewals in relation to any such rights.

12.2    Except as expressly set out in this Agreement, you are not entitled, for any purpose, to any of the Company's IP Rights. We shall at all times retain ownership, including all rights, title and interests in and to the Company's IP Rights and you understand and accept that by making a contribution for the purchase of RIF pursuant to this Agreement you shall not:

a)      acquire or otherwise be entitled to any of the Company's IP Rights;

b)      make a claim in respect of any of the Company's IP Rights or any other equivalent rights; or

c)      use, attempt to use, copy, imitate or modify (whether in whole or in part) any of the Company's IP Rights, except with our prior written consent.

## 13.     Indemnity

13.1    To the fullest extent permitted by applicable law, you will indemnify, defend and hold harmless the Company, the RIF Entities and each of our respective past, present and future employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the "**Company Indemnified Parties**") from and against any and all claims, demands, actions, damages, losses, costs and expenses (including reasonable professional and legal fees) that arise from or relate to:

a)      your acquisition or use of RIF under this Agreement;

b)      the performance or non-performance of your responsibilities or obligations under this Agreement;

c)      your breach of any of the terms and conditions set out in this Agreement; or

d)      your breach of any rights of any other person or entity.

13.2    The Company reserves the right to exercise sole control over the defence, at your sole cost and expense, of any claim subject to an indemnity set out in clause 13.1.

13.3    The indemnity set out in this clause 13 is in addition to, and not in lieu of, any other remedies that may be available to the Company under applicable law.

## 14.     Exclusion of Representations and Warranties



14.1    To the fullest extent permitted by applicable law and except as otherwise specified in writing by us:

    a)    RIF are sold on an "as is" and "as available" basis, without any warranties or representations of any kind, and we expressly disclaim all warranties and representations relating to RIF (whether express or implied), including, without limitation, any implied warranties of merchantability, fitness for a particular purpose, title and non-infringement;

    b)    we do not represent or warrant that RIF are reliable, current or defect-free, meet your requirements, or that any defects will be corrected; and

    c)    we cannot and do not represent or warrant that RIF or the delivery mechanism for RIF are free of viruses or other harmful components.

## 15.    Limitation of Liability

15.1    To the fullest extent permitted by applicable law, in no circumstances shall:

    a)    the Company, the RIF Entities or any of the Company Indemnified Parties be liable for any direct, indirect, special, incidental or consequential loss of any kind (including, but not limited to, loss of revenue, income, business or profits, loss of contract or depletion of goodwill, loss of anticipated savings, loss of use or data, or damages for business interruption or any like loss) arising out of or in any way related to the acquisition, storage, transfer or use of RIF or otherwise related to this Agreement, regardless of the cause of action, whether based in contract, tort (including negligence), breach of statutory duty, restitution or any other legal or equitable basis (even if the Company, the RIF Entities or any of the Company Indemnified Parties have been advised of the possibility of such losses and regardless of whether such losses were foreseeable); and

    b)    the maximum aggregate liability of the Company, the RIF Entities and the Company Indemnified Parties (jointly), whether in contract, tort (including negligence), breach of statutory duty, restitution or any other legal or equitable basis, arising out of or relating to this Agreement or the use of or inability to use RIF, exceed the amount of your contribution.

15.2    The limitations and exclusions of liability set out in clause 15.1 shall not limit or exclude liability for the gross negligence, fraud or intentional, wilful or reckless misconduct of the Company, the RIF Entities or any Company Indemnified Party, nor shall it limit or exclude any losses for which, as a matter of applicable law, it would be unlawful to limit or exclude liability.

## 16.    Taxation

16.1    You are solely responsible for determining whether your contribution to the Company for the purposes described hereunder, the creation, ownership, use, sale, transfer or liquidation of RIF, the potential appreciation or depreciation in the value of RIF over time (if any), the issue of RIF and/or any other action or transaction contemplated by this Agreement or related to the RIFOS Protocols will give rise to any tax implications on your part.

16.2    You are also solely responsible for withholding, collecting, reporting, paying, settling and/or remitting any and all taxes to the appropriate tax authorities in such jurisdiction(s) in which you may be liable to

DocuSign Envelope ID: 10C6BE35-8484-49A2-9F8D-EE7FC8BDEFFA

pay tax. The Company shall not be responsible for withholding, collecting, reporting, paying, settling and/or remitting any taxes (including, but not limited to, any income, capital gains, sales, value added or similar tax) which may arise from your contribution and/or acquisition of RIF under or in connection with this Agreement.

16.3    You agree not to hold the Company, the RIF Entities or any of the Company Indemnified Parties liable for any tax liability associated with or arising from the creation, ownership, use or liquidation of RIF or any other action or transaction related to the RIFOS Protocols or the Token Sale.

**17.    Data Protection**

17.1    Pursuant to the Whitelisting Process, we may require you to provide information and/or documents relating to (without limitation):

   a)        your identity;

   b)        your residential and/or business address;

   c)        the source of your wealth;

   d)        the source of funds used for the purposes of purchasing RIF;

   e)        your Source Wallet; and/or

   f)        any other documents or data from which you can be identified,

   (together, your "**Personal Data**").

17.2    We will not disclose your Personal Data except as expressly permitted under this Agreement and otherwise only with your prior consent. However, we may be required to disclose your Personal Data and/or certain other information about you to the extent required by applicable law or by an order of a court or competent governmental or regulatory authority. By accepting this Agreement, you expressly agree and consent to your Personal Data being disclosed to third parties to any extent required for the purposes of compliance with applicable law.

17.3    We shall process your Personal Data in accordance with the Gibraltar Data Protection Act 2004, as may be amended from time to time ("**Data Protection Act**"), and you agree that we, as the data controller, may directly or through our service providers or agents process your Personal Data for any one or more of the following purposes:

   a)        the purchase of RIF pursuant to this Agreement and the processing of transactions related to the Token Sale;

   b)        carrying out anti-money laundering, "know your customer" and other similar checks;

   c)        providing you with information about us and our range of services;

   d)        complying with any requirement imposed by applicable law or by an order of a court or competent governmental or regulatory authority;

DocuSign Envelope ID: 40C6BF3F-8484-49A2-9F8D-EE7FC08DEFFA



e)      management of enquiries and complaints;

f)      opening, maintaining or operating a bank account in the Company's name;

g)      subject to clause 18, resolving any Disputes (as such term is defined in clause 18.1 below) with you;

h)      producing summary information for statistical, regulatory and audit purposes; and/or

i)      any other reasonable purposes in accordance with applicable law.

17.4    Under the Data Protection Act you have a right to access your Personal Data held by us, and it is your responsibility to inform us of any changes to your Personal Data to ensure such data remains accurate. You also have a right to object to your Personal Data being processed for the purposes of direct marketing. You agree to provide a written request to us should you wish to enforce these rights.

17.5    You agree that we may, for the purposes set out in clause 17.3, permit the transfer of your Personal Data to any jurisdiction, whether or not inside the European Economic Area, and that by accepting this Agreement you authorise and expressly consent to the processing of your Personal Data by us, our agents and/or our service providers, provided that where your Personal Data is processed by entities other than us, our agents or our service providers, we shall seek your prior written consent in respect of such processing.

17.6    You acknowledge, accept and understand that this Agreement, insofar as it relates to the controlling and processing of your Personal Data by the Company, our agents and/or service providers, is only relevant to the processing of your Personal Data for the purposes set out in clause 17.3. In order to access, use and interact with the RIFOS Services, you will be required to accept RIFOS Service Terms which shall also set out the terms and conditions under which your Personal Data is collected, stored and processed (as well as your individual rights under applicable data protection laws) in connection with your use of the RIFOS Services.

**18.    Dispute Resolution by Arbitration**

PLEASE READ THE FOLLOWING CLAUSE CAREFULLY BECAUSE IT CONTAINS CERTAIN PROVISIONS, SUCH AS A BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER, WHICH AFFECT YOUR LEGAL RIGHTS. THIS CLAUSE REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH THE COMPANY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US.

18.1    **Binding Arbitration**. Except for any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "**Disputes**") in which either Party seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property, including, without limitation, copyrights, trademarks, trade names, logos, trade secrets or patents, you and the Company: (i) waive your and the Company's respective rights to have any and all Disputes arising from or related to this Agreement resolved in a court, and (ii) waive your and the Company's respective rights to a jury trial. Instead, you and the Company agree to arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).



18.2 **No Class Arbitrations, Class Actions or Representative Actions**. Any Dispute arising out of or related to this Agreement is personal to you and the Company and will be resolved solely through individual arbitration and will not be brought as a class or group arbitration, class or group action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

18.3 **Arbitration Rules**. Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the rules of the London Court of International Arbitration ("**LCIA Rules**"), which are available at http://www.lcia.org/Dispute_Resolution_Services/lcia-arbitration-rules-2014.aspx http://www.lcia.org/Dispute_Resolution_Services/lcia-arbitration-rules-2014.aspx and are deemed to be incorporated by reference in this clause 18. By agreeing to be bound by this Agreement, you either (i) acknowledge and agree that you have read and understand the LCIA Rules, or (ii) waive your opportunity to read the LCIA Rules and any claim that the LCIA Rules are unfair or should not apply for any reason.

18.4 **Notice; Informal Dispute Resolution**. Each Party will notify the other Party in writing of any Dispute within thirty (30) days of the date it arises, so that the Parties can attempt in good faith to resolve the Dispute informally. Notice to the Company shall be sent by e-mail to contributors@rifbyrsk.org. Notice to you shall be sent to the email address you provide to us in the Contribution Form. Your notice must include (i) your name, postal address, email address and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that you are seeking. If you and the Company cannot agree how to resolve the Dispute within thirty (30) days after the date that the notice is received by the applicable Party, then either you or the Company may, as appropriate and in accordance with this clause 18, commence an arbitration proceeding or, to the extent specifically provided for in clause 18.1, file a claim in court.

18.5 **Process**. The seat, or legal place, of arbitration shall be Gibraltar. The arbitration will be conducted confidentially by a single arbitrator appointed in accordance with the LCIA Rules. The language to be used in the arbitral proceedings shall be English. The governing law of this Agreement shall be the substantive law of Gibraltar and the Gibraltar court will have exclusive jurisdiction over any appeals and the enforcement of an arbitration decision.

18.6 **Authority of Arbitrator.** This Agreement, the applicable LCIA Rules and the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute may be subject to arbitration, and (ii) the authority to grant any remedy that would otherwise be available in court, provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative or class action, which is prohibited by this Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

18.7 **Severability of Dispute Resolution and Arbitration Provisions.** If any term, clause or provision of this clause 18 is held invalid or unenforceable, it will be so held to the minimum extent applicable and required by law, and all other terms, clauses and provisions of this clause 18 will remain valid and



enforceable. Further, the waivers set forth in clause 18.2 above are severable from the other provisions of this Agreement and will remain valid and enforceable, except as prohibited by applicable law.

## 19. Confidential Information / Announcements

19.1 Notwithstanding any other provision of this Agreement, the Parties agree to hold each other's Confidential Information (as such term is defined in clause 19.2 below) confidential for a period of three (3) years following the date of this Agreement or any rescission, termination or repudiation hereof. The Parties agree that unless required by law, they shall not make each other's Confidential Information available in any form to any third party or to use each other's Confidential Information for any purpose other than the implementation of this Agreement. Each Party agrees to take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or agents in breach of this Agreement.

19.2 "**Confidential Information**" shall mean in relation to a Party, all material and information that has or will come into possession or knowledge of the other Party in connection with its performance hereunder and which in the ordinary course of business is considered to be treated confidential. The Whitepaper and the content of this Agreement, not including the fact that it has been entered into, shall also constitute Confidential Information. A Party's "Confidential Information" shall not include information that: (a) is or becomes a part of the public domain through no act or omission of the other Party; (b) was in the other Party's lawful possession prior to the disclosure and had not been obtained by the other Party either directly or indirectly from the disclosing Party; (c) is lawfully disclosed to the other Party by a third party without restriction on disclosure; (d) is independently developed by the other Party; or (e) is required to be disclosed by any judicial or governmental requirement or order (provided that the recipient timely advises the disclosing Party of the judicial or governmental demand for disclosure).

19.3 Without the prior written consent of the other Party, neither Party shall make any public announcements, issue any media release or similar publicity relating to this Agreement.

19.4 Without prejudice to any other rights or remedies that each Party may have, each Party acknowledges and agrees that damages alone would not be an adequate remedy for any breach of the terms of this clause 19 by the other Party. Accordingly, each Party shall be entitled to the remedies of injunctions, specific performance or other equitable relief for any threatened or actual breach of this clause 19.

## 20. Force Majeure

The Company shall not be liable or responsible to the Contributor, or be deemed to have breached this Agreement, for any failure or delay in fulfilling or performing its obligations under this Agreement, if and to the extent such failure or delay is caused by, results from or is otherwise connected to acts beyond its reasonable control, including, without limitation: (a) acts of God; (b) flood, fire, earthquake or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist, hacking or cyber threats, attacks or acts, or other civil unrest; (d) any laws, statutes, ordinances, rules, regulations, judgments, injunctions, orders and decrees; or (e) action by any nation or government, state or other political subdivision thereof, any entity exercising legislative, regulatory, judicial or administrative

24

DocuSign Envelope ID: 40C6BE3F-8484-49A2-9E8D-EE7FC06DEEFA



functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or council.

21. **Notices**

21.1    Any notice given to a Party under or in connection with this Agreement shall be in writing and shall be sent by email to:

a)        the Company: contributors@rifbyrsk.org; and

b)        the Contributor: the email address specified on the Contribution Form.

21.2    Any notice or communication shall be deemed to have been received at the time of transmission of the notice by email, or where such time is outside of Business Hours, at 9.00 am on the next Business Day after transmission.

21.3    This clause 21 does not apply to the service of any proceedings or any documents in any legal action or, where applicable, any arbitration or other method of dispute resolution.

22. **Miscellaneous**

22.1    The Contributor understands and accepts that the RSK Smart Protocol is a decentralized open source protocol layer and that at any point participants in the ecosystem can agree on consensus changes to the Smart Contract System. Such a scenario could lead to RIF losing intrinsic value.

22.2    No variation of this Agreement shall be effective unless it is in writing and signed by the Parties (or their authorised representatives).

22.3    No Party may transfer and/or assign any of its rights, interests, benefits and/or obligations under this Agreement without the express written consent of the other Party except that the Company shall be entitled to transfer and/or assign all or any of its rights, interests, benefits and/or obligations under this Agreement, the RIFOS Protocols and/or the Project Documentation to (a) any of the RIF Entities; (b) a third party that acquires all or substantially all of the assets or equity of the Company; or (c) any entity into which the Company shall merge or any affiliate thereof, and the Contributor irrevocably and unconditionally consents to such transfer and/or assignment.

22.4    If any term, clause or provision of this Agreement is found to be illegal, void or unenforceable (in whole or in part), then such term, clause or provision shall be severable from this Agreement without affecting the validity or enforceability of any remaining part of that term, clause or provision, or any other term, clause or provision of this Agreement, which shall remain in full force and effect.

22.5    Subject to clause 1.6 a waiver of any right or remedy under the Agreement or by law is only effective if given in writing and shall not be deemed a waiver of any subsequent right or remedy. A failure or delay by a Party to exercise any right or remedy provided under the Agreement or by law shall not constitute

DocuSign Envelope ID: 10C6BE3E-8481-49A2-9E8D-EE7FC08DEFFA



a waiver of that or any other right or remedy, nor shall it prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under the Agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

22.6    This Agreement constitutes the entire agreement between the Parties in relation to its subject matter. This Agreement replace and extinguish any and all prior agreements, draft agreements, arrangements, warranties, statements, assurances, representations and undertakings of any nature made by, or on behalf of the Parties, whether oral or written, public or private, in relation to that subject matter.

22.7    You acknowledge that by accepting this Agreement, you have not relied on any oral or written statements, warranties, assurances, representations or undertakings which were or may have been made by or on behalf of the Company in relation to the subject matter of this Agreement at any time before your acceptance of them ("**Pre-Contractual Statements**"), other than those set out in this Agreement. You hereby waive any and all rights and remedies which might otherwise be available in relation to such Pre-Contractual Statements.

22.8    Nothing in this Agreement shall be deemed to create any form of partnership, joint venture or any other similar relationship between you and either of the Company, any individuals or entities involved with the development and deployment of the Smart Contract System, the RIF Entities and/or the Company Indemnified Parties.

22.9    Subject to clause 18, this Agreement and any Dispute arising out of or in connection with its subject matter or formation (including non-contractual Disputes) shall be governed by and construed in accordance with Gibraltar law and the Parties irrevocably agree that the Gibraltar courts shall have exclusive jurisdiction to settle any Dispute that arises out of or in connection with this Agreement or its subject matter or formation (including non-contractual Disputes).

* * * * * *



**SCHEDULE 1**

**INTENDED FUNCTIONALITY OF RIF ON THE RIFOS PROTOCOLS**

Activity in the RIFOS Protocols' ecosystem is intended to be performed primarily using RIF. In that sense, RIF's principal purpose is therefore to enable users to activate and consume the RIFOS Services that are made available by RIFOS Service Providers implementing the RIFOS Protocols.

RIF is not intended to have any functionality or utility outside the RIFOS Services implementing the RIFOS Protocols. While the RIFOS Protocols will be available for anyone to use (with the goal being to set up a clear and open standard framework so that external developers and applications can participate and grow the RIFOS Protocols' ecosystem), the utility of RIF is limited to enabling interaction with and usage of the RIFOS Services, APIs and dApps that are exclusively available from RIFOS Service Providers that have implemented the RIFOS Protocols. In that context, the RIFOS Services, APIs and dApps integrated into the RIFOS Protocols' ecosystem will therefore be structured as a "closed ecosystem" insofar as the use of RIF is concerned.

**RIF TOKEN CREATION AND INTENDED DISTRIBUTION**

It is envisaged that a total one billion (1,000,000,000) RIF will be created out of which:

(a)   Up to a maximum of forty percent (40%) shall be issued and distributed to Contributors during the Token Sale;

(b)   Twenty percent (20%) shall be issued and distributed to founders and investors of the RSK Smart Protocol, to be released as follows:

  (i)   An initial instalment equal to 6/48ths of the RIF reserved for founders and investors of the RSK Smart Protocol, six (6) months after the SCS Deployment Date;

  (ii)   1/48 each month thereafter for a period of forty-two (42) months; and

(c)   All the remaining unallocated RIF shall be issued and distributed to the Company for future use at its sole discretion over a period of five (5) years with a monthly issuance and distribution of 1/60[th] of the RIF in every instalment, provided that ten percent (10%) shall be earmarked and applied by the Company towards growing the RIFOS Protocol's ecosystem and business development initiatives (also to be released proportionately over a period of five (5) years with monthly distribution).

The proposed distribution of RIF described above is only indicative and may be subject to change without further notice.

**POSSIBILITY OF CHANGE TO THE FUNCTIONALITY OF RIF**

PLEASE NOTE THAT WE ARE IN THE PROCESS OF UNDERTAKING A LEGAL AND REGULATORY ANALYSIS OF THE FUNCTIONALITY OF RIF. FOLLOWING THE CONCLUSION OF THIS ANALYSIS, WE MAY DECIDE TO AMEND THE INTENDED FUNCTIONALITY OF RIF IN ORDER TO ENSURE COMPLIANCE WITH ANY LEGAL OR REGULATORY REQUIREMENTS TO WHICH WE ARE SUBJECT. WE SHALL SEND YOU A NOTICE AND PUBLISH A STATEMENT ON THE COMPANY'S TOKEN SALE COMMUNICATION CHANNELS WEBSITE OF ANY CHANGES THAT WE DECIDE TO MAKE TO THE FUNCTIONALITY OF RIF AND IT IS YOUR RESPONSIBILITY TO REGULARLY CHECK THE COMPANY'S TOKEN SALE COMMUNICATION CHANNELS FOR ANY SUCH STATEMENTS. FOLLOWING THE CONCLUSION OF THIS ANALYSIS, WE WILL DECIDE WHETHER OR NOT TO CHANGE THE FUNCTIONALITY OF RIF.

DocuSign Envelope ID: 40C6BE8F-8484-49A2-9E8D-EE7FC08DEEEA



**SCHEDULE 2**

**CONTRIBUTOR'S REPRESENTATIONS AND WARRANTIES**

By making a contribution and accepting this Agreement, you hereby represent and warrant that:

1.  You have read and understood this Agreement (including the Agreement Details, Contribution Form, General T&Cs and all the Schedules hereto);

2.  You have the necessary authority and consent to accept this Agreement, to enter into a binding agreement with the Company and to perform the obligations set out herein;

3.  The acceptance of this Agreement and the entry into a legally binding contract with the Company shall not result in any breach of, be in conflict with, or constitute a material default under: (a) any provision of the Contributor's constitutional or organisational documents (in the case of a corporate entity including, without limitation, any company or partnership); (b) any provision of any judgment, decree or order imposed on the Contributor by any court or governmental or regulatory authority; and/or (c) any material agreement, obligation, duty or commitment to which the Contributor is a party or by which the Contributor is bound;

4.  You have sufficient understanding of the functionality, usage, storage, transmission mechanisms and intricacies associated with cryptographic tokens (such as RIF), token storage facilities (including cryptographic token wallets), blockchain technology and blockchain-based software systems;

5.  You have obtained sufficient information about the intended and potential future use and functionality of RIF to make an informed decision to make a contribution for the purchase of RIF under the terms of this Agreement;

6.  You understand that RIF confer only a limited potential future right or expectation to use and interact with the RIFOS Services, APIs and/or dApps implementing the RIFOS Protocols as more particularly described in Schedule 1 to this Agreement, and that RIF confer no other rights of any kind with respect to the Company and/or the RIFOS Protocols, including, but not limited to, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property rights), or other financial or legal rights;

7.  If you are an individual, you are at least 18 years of age, you have sufficient legal capacity to accept this Agreement and to enter into a binding agreement with the Company on the terms set out herein;

8.  If you are making a contribution for the acquisition of RIF as a corporate entity including, without limitation, any company or partnership (or other type of legal entity that is not a natural person), such entity is duly incorporated, registered and validly existing under the applicable laws of the jurisdiction in which the entity is established;

9.  If you are making a contribution for the purchase of RIF for or on behalf of an entity or person, you are authorized to accept this Agreement and enter into a binding agreement with the Company on such entity's or person's behalf (and in such circumstances, references in this Agreement to "Contributor", "your" or "you" shall be a reference to the entity or person on whose behalf you are authorised to make a contribution);

DocuSign Envelope ID: 40C6BE3F-8484-49A2-9EBD-EE7FC6BDEFFA



10.     You are making a contribution for the purchase of RIF to support the development, testing, deployment and operation of the RIFOS Protocols and to potentially use and interact with the RIFOS Services, APIs and/or dApps implementing RIFOS Protocols at a future point in time. You are not making a contribution under this Agreement for any other uses or purposes, including, but not limited to, any investment, speculative or other financial purposes;

11.     Any contribution to be made by you for the purchase of RIF is not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing activities;

12.     You shall not use RIF to finance, engage in, or otherwise support any unlawful activities;

13.     Your contribution shall be transferred to the Company from a BTC Compatible Wallet or ETH Compatible Wallet that: (a) is registered in your name or in the name of a person who is duly authorised by you to send a contribution on your behalf to the Company; and (b) is not located in or that is not registered in the name of a person located in or resident of any Prohibited Jurisdiction;

14.     Making a contribution and receiving RIF under this Agreement is not unlawful or prohibited under the laws of your jurisdiction or under the laws of any other jurisdiction to which you may be subject and any contribution shall be made in full compliance with applicable laws (including, but not limited to, in compliance with any tax obligations to which you may be subject in any relevant jurisdiction);

15.     You are not a citizen of or resident or domiciled in any of the Prohibited Jurisdictions or making a contribution for the purchase of RIF from a location in any of the Prohibited Jurisdictions, nor are you an entity (including, but not limited to, any company or partnership) incorporated, established or registered in or under the laws of any of the Prohibited Jurisdictions, nor are you making a contribution for the purchase of RIF for or on behalf of any such person or entity;

16.     You are not the subject of any sanctions administered or enforced by any country, government or international authority nor are you resident or established (in the case of a corporate entity) in a Sanction Country;

17.     You will comply with any applicable tax obligations in your jurisdiction arising from your acquisition, storage, sale or transfer of RIF; and

18.     You understand and accept the risks of participating in token sales relating to early stage blockchain start-up businesses and acknowledge that these risks are substantial. You further warrant and represent that your contribution does not represent a meaningful or substantial proportion of your wealth or net worth, and that you are willing to accept the risk of loss associated with the contribution made under this Agreement.



**SCHEDULE 3**

**RISK FACTORS**

1.    **Risk of software weaknesses**: because RIF, the Smart Contract System and the RIFOS Protocols rely on the Bitcoin blockchain and RSK Smart Protocol, any malfunction, breakdown or abandonment of the Bitcoin blockchain and/or RSK Smart Protocol may have a material adverse effect on RIF, the Smart Contract System and/or the services implementing RIFOS Protocols. Moreover, advances in cryptography, or technical advances such as the development of quantum computing, could present risks to RIF (including the utility of RIF), the Smart Contract System and/or the services implementing RIFOS Protocols, by rendering ineffective the cryptographic consensus mechanism that underpins the Bitcoin blockchain and the RSK Smart Protocol. The Smart Contract System concept, the underlying software application and software platform (i.e. the Bitcoin blockchain and RSK Smart Protocol) is still in an early development stage. There is no warranty or assurance that the process for creating RIF will be uninterrupted or error-free and there is an inherent risk that the software could contain defects, weaknesses, vulnerabilities, viruses or bugs causing, inter alia, the complete loss of contributions and/or RIF.

2.    **Regulatory risk**: blockchain technology allows new forms of interaction and it is possible that certain jurisdictions will apply existing regulations on, or introduce new regulations addressing blockchain technology based applications, which may be contrary to the current setup of the Smart Contract System and which may, inter alia, result in substantial modifications to the Smart Contract System and/or the RIFOS Protocols, including its termination and the loss of RIF for the Contributor. Additionally, regulation of proposed activities of the RIFOS Protocols is currently uncertain. It is not known what regulatory framework the proposed RIFOS Protocols, associated activities, and services will be subject to, the nature and obligations that will be imposed on the Company in order to comply with any such regulatory framework or when/if the Company will even be able to apply to be regulated, or successfully obtain the necessary licences so that it may lawfully carry out its proposed activities.

3.    **Risks associated with uncertain regulations and enforcement actions**: the regulatory status of the Company and distributed ledger technology is unclear or unsettled in many jurisdictions. It is difficult to predict how or whether regulatory authorities may apply existing regulation with respect to such technology and its applications, including specifically (but without limitation to) the RIFOS Protocols and RIF. It is likewise difficult to predict how or whether any legislative or regulatory authorities may implement changes to law and regulation affecting distributed ledger technology and its applications, including specifically (but without limitation to) the RIFOS Protocols and RIF. Regulatory actions could negatively impact the RIFOS Protocols and RIF in various ways, including, for purposes of illustration only, through a determination that RIF are a regulated financial instrument that requires registration or licensing. The Company may cease operations in a jurisdiction in the event that regulatory actions, or changes to law or regulation, make it illegal to operate in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction.

4.    **Risk of abandonment / lack of success**: the creation and issue of RIF and the development of the RIFOS Protocols may be abandoned for a number of reasons, including lack of interest from the public, lack of funding, lack of commercial success or prospects (e.g. caused by competing projects). There is no assurance that, even if the RIFOS Protocols and RIFOS Service implementing the RIFOS Protocols are partially or fully developed and launched, you will receive any benefits through RIF that you hold.

DocuSign Envelope ID: 40C6BE3F-8A84-49A2-9F8D-EE7FC88DEFFA



5.     **Risk associated with other applications**: the RIFOS Protocols may give rise to other, alternative projects, promoted by unaffiliated third parties, under which RIF will have no intrinsic value.

6.     **Risks associated with markets for RIF:** RIF may not enable or otherwise facilitate any secondary market trading or any such external valuation of RIF. This may restrict the contemplated avenues for using RIF to the token functionality described in Schedule 1 to this Agreement and could therefore create illiquidity risk with respect to any RIF you own. Even if secondary trading of RIF is facilitated by third-party exchanges, such exchanges may be relatively new and subject to little or no regulatory oversight, making them more susceptible to fraud or manipulation. Furthermore, to the extent that any third party ascribes an external exchange value to RIF (e.g. as denominated in a cryptographic or fiat currency), such value may be extremely volatile and diminish to zero. If you are purchasing RIF as a form of investment on a speculative basis or otherwise, or for a financial purpose, with the expectation or desire that their inherent, intrinsic or cash-equivalent value may increase with time, you assume all risks associated with such speculation or actions, and any errors associated therewith, and accept that the RIF are not offered by the Company on an investment basis. You further acknowledge that any contribution that you make under this Agreement will not be protected, guaranteed or reimbursed by any governmental, regulatory or other entity, and will not, for instance be guaranteed by the Gibraltar Deposit Guarantee Scheme, the Gibraltar Investor Compensation Scheme, and is unlikely to be protected by any equivalent scheme in a jurisdiction outside of Gibraltar.

7.     **Risk of losing access to tokens due to loss of private key(s), custodial error or your error**: RIF can only be accessed by using an RSK-compatible wallet (currently integrating Jaxx, MyEtherWallet and RSK's command line client) with a combination of the Contributor's account information (address), private key and password. The private key is encrypted with a password. You acknowledge, understand and accept that if your private key or password gets lost or stolen, the obtained RIF associated with your RSK-compatible wallet may be unrecoverable and permanently lost. Additionally, any third party that gains access to your private key, including by gaining access to the login credentials relating to your RSK-compatible wallet, may be able to misappropriate your RIF. Any errors or malfunctions caused by or otherwise related to the digital wallet or vault you choose to receive and store RIF, including your own failure to properly maintain or use such digital wallet or vault, may also result in the loss of your RIF.

8.     **Risk of theft**: The Smart Contract System concept, the underlying software application and software platform (i.e. the Bitcoin blockchain and/or the RSK Smart Protocol) may be exposed to attacks by hackers or other individuals including, but not limited to, malware attacks, denial of service attacks, consensus-based attacks, Sybil attacks, smurfing and spoofing. Any such successful attacks could result in theft or loss of contributions or RIF, adversely impacting the ability to develop the RIFOS Protocols and derive any usage or functionality from RIF. Furthermore, because the RIFOS Protocols are based on open-source software, there is a risk that a third party or a member of the Company's team may intentionally or unintentionally introduce weaknesses or defects into the core of the RIFOS Protocols, which could negatively affect the RIFOS Services implementing the RIFOS Protocols and RIF.

9.     **Risk of mining attacks**: as with other cryptocurrencies, the blockchain used for the Smart Contract System is susceptible to mining attacks, including but not limited to double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and rare condition attacks. Any successful attacks present a risk to the Smart Contract System, expected proper execution and sequencing of token transactions, and expected proper execution and sequencing of contract computations. You

DocuSign Envelope ID: 40C6BE3E-8484-49A2-9EBD-EE7FC08DEFFA



understand and accept that the network of miners can ultimately censor or reverse RIF transactions, and that such a scenario could lead to the RIF losing intrinsic value and/or functionality.

10.  **Risk of incompatible wallet service**: the wallet or wallet service provider used to receive RIF must conform to the ERC20 token standard and work on the RSK Smart Protocol in order to be technically compatible with RIF. The failure to ensure such conformity may have the result that you will not gain access to your RIF.

11.  **Risk of RSK Smart Protocol hard-fork**: the underlying blockchain of the RIFOS Protocols will need to go through substantial development works as part of which it may become the subject of significant conceptual, technical and commercial changes before release. As part of the development, an upgrade the underlying Blockchain of RIF may be required (hard-fork of the underlying Blockchain supporting RIF) and that, if you decide not to participate in such upgrade, you may no longer be able to use your RIF and any non-upgraded RIF may lose its functionality in full.

12.  **Risk of Federated Peg:** The current bridge mechanism of the RSK Smart Protocol relies on a group of companies that form the so-called RSK Federation. Each of these companies has a private key that is part of a multi-signature that controls the funds in the bridge mechanism. Even if these companies followed security best practices, there is an inherent risk of internal and external bad actors obtaining those private keys to steal funds from the bridge mechanism. You acknowledge and understand that such a scenario could lead to the RIF losing intrinsic value.

13.  **Risk of uninsured losses**: unlike bank accounts or accounts at some other financial institutions, RIF are uninsured unless you specifically obtain private insurance to insure them. Thus, in the event of loss or loss of utility value, there is no public insurer or private insurance arranged by us, to offer recourse to you.

14.  **Risks arising from taxation**: the tax characterization of RIF is uncertain. You must seek your own tax advice in connection with acquisition, storage, transfer and use of RIF, which may result in adverse tax consequences to you, including, without limitation, withholding taxes, transfer taxes, value added taxes, income taxes and similar taxes, levies, duties or other charges and tax reporting requirements.

15.  **Risk of an unfavourable fluctuation of Bitcoin/Ethereum and other currency value**: RIF intends to use the contributions received to fund the development of the RIFOS Protocols and various other operating expenses. The contributions received will be principally denominated in Bitcoin and Ether, and may be converted into other cryptographic and fiat currencies. If the value of Bitcoin, Ether and/or other currencies fluctuates unfavourably during or after the Token Sale, the Company may not be able to fund the development of, or may not be able to maintain, the RIFOS Protocols in the manner intended.

16.  **Risk of dissolution of the Company or the service provider(s) implementing RIFOS Protocols**: it is possible that, due to any number of reasons, including, but not limited to, an unfavourable fluctuation in the value of Bitcoin, Ether (or other cryptographic and fiat currencies), decrease in RIF utility due to negative adoption of the RIFOS Protocols, the failure of commercial relationships or intellectual property ownership challenges, service providers implementing RIFOS Protocols may no longer be viable to operate and the Company may dissolve and may not be able to continue the development of the RIFOS Protocols.

DocuSign Envelope ID: 40C6BE3F-8A84-49A2-9FBD-EE7FC6BDEFFA



17.   **Risks arising from lack of governance rights**: because RIF confer no governance rights of any kind with respect to the RIFOS Protocols or the Company; all decisions involving the Company (including to sell or liquidate the Company) will be made by the Company acting in its sole and absolute discretion, and all decisions involving the RIFOS Protocols including, but not limited to, decisions to discontinue the development of the RIFOS Protocols, to create and issue more RIF, will be made by the Company. These decisions could adversely affect the RIFOS Protocols' ecosystem and/or RIF you hold.

18.   **Risks arising from the market in which the service providers implementing RIFOS Protocols operate**: the service providers implementing RIFOS Protocols may be subject to a variety of federal, state, national and international laws and regulations. These laws and regulations, and the interpretation or application of these laws and regulations, could change. In addition, new laws or regulations affecting the RIFOS Protocols could be enacted, which could impact the utility of RIF with respect to the RIFOS Services. Additionally, users of the RIFOS Services are subject to or may be adversely affected by industry specific laws and regulations or licensing requirements. If for whatever reason the RIFOS Services Providers in charge of running the RIFOS Services are unable or fail to comply with any of these licensing requirements or other applicable laws or regulations, or if such laws and regulations or licensing requirements become more stringent or are otherwise expanded, it could adversely impact the RIFOS Services offered on the RIFOS Protocols, the RIFOS Protocols' ecosystem as a whole and RIF.

19.   **Risks associated with the development and maintenance of the RIFOS Protocols:** the RIFOS Protocols are still under development and may undergo significant changes over time. Although we intend for RIF and the RIFOS Protocols to function as described in the Agreement Details and Schedule 1 of this Agreement and intend to take commercially reasonable steps towards those ends, we may have to make changes to the specifications of RIF or the RIFOS Protocols for any number of legitimate reasons. Moreover, we may not be able to retain full and effective control over how other participants will implement services based on the RIFOS Protocols, what products or services will be offered through the platforms implementing RIFOS Protocols by third parties, or how third-party products and services will utilize RIF (if at all). This could create the risk that RIF or the RIFOS Protocols, as further developed and maintained, may not meet your expectations at the time of purchase. Furthermore, despite our good faith efforts to develop the RIFOS Protocols, it is still possible that the RIFOS Protocols will experience malfunctions or otherwise fail to be adequately developed or maintained, which may negatively impact the service offering compatible with the RIFOS Protocols and RIF, and the potential utility of RIF thereon.

20.   **Risk of Competing Platforms:** it is possible that alternative platforms or protocols could be established that utilize the same open source code and RIFOS Protocols and attempt to facilitate services that are materially similar to the services offered by RIFOS Service Providers. The RIFOS Protocols' ecosystem may compete with these alternatives, which could negatively impact the RIFOS Protocols' ecosystem and RIF, including the utility of RIF for obtaining RIFOS Services offered by RIFOS Service Providers.

21.   **Unanticipated Risks:** cryptographic tokens such as RIF are a new and untested technology. In addition to the risks set out in this Schedule 3 to this Agreement, there are other risks associated with your acquisition, storage, transfer and use of RIF, including those that the Company may not be able to anticipate. Such risks may further materialize as unanticipated variations or combinations of the risks set out in this Schedule 3 to this Agreement.

22.   **Risk of Bitcoin Hardfork.** The RSK Smart Protocol was designed to be linked to a single Bitcoin blockchain. Should part of the community decide to change Bitcoin consensus rules, a Bitcoin hardfork

DocuSign Envelope ID: 10C6BF35-9481-49A2-9F8D-EE7FC08DEFFA



can be originated, causing two Bitcoin-like blockchains to appear. RSK will be pegged to only one of these chains. Such a scenario could lead to the RIF losing intrinsic value.



**SCHEDULE 4**

**DEFINITIONS AND INTERPRETATIONS**

1.  **DEFINITIONS**

| | |
|---|---|
| Agreement | means this Early Contribution Agreement which is made up of the following documents: (a) the Agreement Details; (b) the Contribution Form; (c) the General T&Cs; and (d) the Schedules. |
| API | means an application programming interface. |
| Base Price | means the price of 1 Bitcoin = 14,000 RIF. |
| Bitcoin Contribution | means a contribution made in Bitcoin by the Contributor to the Company under the terms of this Agreement. |
| BTC Compatible Wallets | means one of the following Bitcoin wallets in respect of which the Contributor has access to and control of the private key: Trezor One, Ledger Nano S or Bitcoin Core. |
| Business Day | means a day, other than a Saturday, Sunday or public holiday, when banks in Gibraltar are open for business. |
| Business Hours | means the period from 9.00 am to 5.00 pm on any Business Day. |
| Company Indemnified Parties | has the meaning given to it in clause 13.1 of the General T&Cs. |
| Company IP Rights | has the meaning given to it in clause 12.1 of the General T&Cs. |
| Confidential Information | has the meaning given to it in clause 19.2 of the General T&Cs. |
| Contingent Redemption Process | has the meaning given to it in clause 5.7 of the General T&Cs. |
| Contribution Costs | means any and all gas costs and other transaction costs and fees levied on or incurred by either Party in connection with the Contributor's transfer of a contribution to the Company. |
| Contribution Form | means the contribution form attached to this Agreement which is to be completed and signed by the Contributor and submitted to the Company as part of the Contribution Offer. |
| Contribution Instructions | means the detailed instructions (to be sent by the Company to a Prospective Contributor following the Company's receipt of the completed and signed Contribution Form) setting out, amongst other things, how a prospective Contributor is to transfer the Proposed Contribution Amount to the Company, including details of the Company's Bitcoin or Ethereum wallet address (as applicable) to which the Proposed Contribution Amount must be sent. |
| Contribution Offer | means the act of completing and signing the Contribution Form, together with the transfer to the Company of the Proposed Contribution Amount, by a Prospective Contributor which constitutes an offer to make a contribution to the Company for the purchase of RIF under the terms of this Agreement. |

DocuSign Envelope ID: 40C6BE3F-8484-49A2-9F8D-EE7FC86DEFFA



| | |
|---|---|
| Contribution Period | means the period of five (5) Business Days commencing from the date on which the Company sends the Contribution Instructions to a Prospective Contributor by email. |
| dApps | means decentralized and distributed software applications that run on a peer-to-peer network of computers. |
| Data Protection Act | means the Gibraltar Data Protection Act 2004, as may be amended from time to time. |
| Delegation Message | has the meaning given to it in clause 5.8 of the General T&Cs. |
| Disputes | means any disputes, claims, suits, actions, causes of action, demands or proceedings between the Parties. |
| ETH Compatible Wallets | means one of the following Ether wallets in respect of which the Contributor has access to and control of the private key: Trezor One, Ledger Nano S or MyEtherWallet. The hardware wallets (i.e. Trezor One and Ledger Nano S) must be used in conjunction with MyEtherWallet. |
| Ether Contribution | means a contribution made in Ether by the Contributor to the Company under the terms of this Agreement. |
| First Lock-in Bonus | has the meaning given to it in clause 1.3 of the General T&Cs. |
| First Lock-in Period | means the period of three (3) months following the SCS Deployment Date. |
| General T&Cs | means the General Early Contribution Terms and Conditions which form part of this Agreement. |
| Initial RIF Allocation | means the initial amount of RIF to be issued to the Contributor which is to be calculated by reference to the Base Price and exclusive of any Lock-in Bonuses to which the Contributor may become entitled. |
| IP Rights | has the meaning given to it in clause 12.1 of the General T&Cs. |
| ITA Wallet | Means the initial token allocation wallet into which the Initial RIF Allocation shall be delivered. The ITA Wallet, which is to be created by the Contributor, shall be a standard, open source cryptocurrency wallet that will be compatible with the receipt, storage and transfer of RIF. Further details relating to the ITA Wallet are set out in clause 5.2. |
| LCIA Rules | means the rules of the London Court of International Arbitration, which are available here http://www.lcia.org/Dispute_Resolution_Services/lcia-arbitration-rules-2014.aspx      http://www.lcia.org/Dispute_Resolution_Services/lcia-arbitration-rules-2014.aspx. |
| Lock-in Bonuses | means the First Lock-in Bonus, Second Lock-in Bonus and Third Lock-in Bonus and references to a "Lock-in Bonus" shall be to the relevant one of them as the context requires. |
| Lock-in Periods | means the First Lock-in Period, Second Lock-in Period and Third Lock-in Period and references to a "Lock-in Period" shall be to the relevant one of them as the context requires. |
| Personal Data | has the meaning given to it in clause 17.1 of the General T&Cs. |

DocuSign Envelope ID: 40C6BE3F-8A84-49A2-9E8D-EE7FC08DEFFA



| Prohibited Jurisdictions | means the United States of America, any Sanction Country and such other countries where participation in token sales and/or the acquisition, possession, storage, transfer or use of cryptocurrencies is prohibited by law. |
|---|---|
| Project Documentation | means the RSK Website and the Whitepaper. |
| Proposed Contribution Amount | means the amount in either Bitcoin or Ether that a Prospective Contributor proposes to contribute to the Company for the purchase of RIF under the terms of this Agreement, as specified in the Contribution Form. |
| Prospective Contributor | means any person who wishes to enter into this Agreement with the Company for the purposes of making a contribution for the purchase of RIF. |
| Redemption Message | means the cryptographic message containing the Contributor's ITA Wallet address which is to be: (a) generated and signed by the Contributor using the Contributor's Source Wallet; and (b) sent to the Smart Contract System by the Contributor in connection with the Redemption Process, as further described in clause 5 of the General T&Cs. |
| Redemption Period | means the period commencing on the SCS Deployment Date and ending on the expiry of 365 days from the SCS Deployment Date. |
| Redemption Process | means the process to be undertaken and completed by the Contributor after the SCS Deployment Date in order to: (a) verify the Contributor's contribution to the Company; and (b) procure the issue and delivery of the Initial RIF Allocation to the Contributor's ITA Wallet through the Smart Contract System, as further described in clause 5 of the General T&Cs. |
| RIF | means the cryptographic token, based on the ERC20 token standard, to be created and issued by the Company (through the Smart Contract System) to a Contributor who makes a contribution to the Company under the terms of this Agreement. The intended functionality of RIF is described in Schedule 1. |
| RIF Entities | means such entities, other than the Company, within the RIF group from time to time that may develop, manage, promote, and/or operate the RIFOS Protocols and related platforms (or parts thereof). |
| RIFOS Protocols | means the RSK Infrastructure Framework Open Standard Protocols, as further described in the Agreement Details and the Project Documentation. |
| RIFOS Service Providers | means the Company, a RIF Entity and/or third-party service providers that make RIFOS Services, APIs and/or dApps available on the RIFOS Protocols. |
| RIFOS Service Terms | means the terms, conditions and policies relating to the use of RIFOS Services, APIs and/or dApps implemented and available on the RIFOS Protocols by RIFOS Service Providers. |
| RIFOS Services | means the decentralized infrastructure services for (but not limited to) smart contract capabilities, scalable and high-speed payment processing, unified naming and directory services, encrypted data storage and secure communications to be implemented with and made available in the RIFOS Protocols' ecosystem. |
| RSK Smart Protocol | means the RSK side-chain protocol which is a smart contract blockchain built as a side-chain to the Bitcoin blockchain as further described in the Agreement Details and the Project Documentation. |



| RSK Website | means https://www.rsk.co/. |
|---|---|
| Sanction Country | means a country or territory that has been designated by the Financial Action Task Force as a "non-cooperative country or territory". |
| SCS Deployment Date | means the date on which Smart Contract System is deployed and activated on the RSK Smart Protocol by the Company for the purposes of (amongst other things) creating, issuing and delivering RIF to the Contributor's ITA Wallet. |
| Second Lock-in Bonus | has the meaning given to it in clause 1.4 of the General T&Cs. |
| Second Lock-in Period | means the period of six (6) months following the SCS Deployment Date. |
| Smart Contract System | has the meaning given to it in clause 4.1 and as further described in clause 4 generally. |
| Source Wallet | means the BTC Compatible Wallet or ETH Compatible Wallet (as the case may be) from which the Contributor sends a contribution to the Company. |
| Third Lock-in Bonus | has the meaning given to it in clause 1.5 of the General T&Cs. |
| Third Lock-in Period | means the period of nine (9) months following the SCS Deployment Date. |
| Token Sale | means the Company's smart contract based private contribution campaign pursuant to which the Company shall issue RIF to Contributors for the purpose of raising capital that it will deploy on researching, developing and promoting the RIFOS Protocols |
| Unaffiliated Third Parties | has the meaning given to it in clause 3.10 of the General T&Cs. |
| US Persons | means (i) any person that is a citizen or resident of the United States of America; (ii) any partnership, company, corporation or other entity organized or incorporated under the laws of the United States of America; (iii) any estate of which any executor is or administrator is a US Person; (iv) any trust of which any trustee is a US Person; (v) any agency or branch of a foreign entity located in the United States of America; and (vi) any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a US Person; (vii) any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States of America; and (viii) any partnership, company, corporation or other entity organized or incorporated under the laws of a jurisdiction (other than the United States of America) which has been formed by a US Person for the purposes of entering into this Agreement or for the purposes of investing in securities (whether or not registered under the Securities Act 1933, as in force from time to time in the United States of America). |
| VWAP | means the 24 hour volume weighted average price ("**VWAP**") for Bitcoin/Ether transactions executed on the Bitstamp Exchange (https://www.bitstamp.net/) during the 24 hour period that ends at 13:00 GMT immediately prior to the Company's receipt of the Ether Contribution into the Company's Ethereum wallet, as further described in clause 1.2 of the General T&Cs. |
| Whitelisting Process | has the meaning given to it in clause 2.1 of the General T&Cs. |



| Whitepaper | means the Company's whitepaper containing, amongst other things, background information relating the Company, the RSK Smart Protocol, the RIFOS Protocols, the Company's intended development activities, the founding team behind the project and other associated information. A copy of the Whitepaper will be sent to you via email. |

## 2.  INTERPRETATIONS

2.1.    Clause, schedule and paragraph headings shall not affect the interpretation of this Agreement.

2.2.    A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

2.3.    Unless otherwise specified, references to clauses are to the clauses of the General T&Cs, which form part of this Agreement, and references to schedules are to the Schedules of this Agreement.

2.4.    The Agreement Details, General T&Cs, Schedules and Contribution Form all form part of this Agreement and shall read and construed as one document. Any reference to this Agreement includes the Agreement Details, General T&Cs, Schedules and the Contribution Form.

2.5.    Words in the singular shall include the plural and vice versa.

2.6.    Unless the context otherwise requires, a reference to one gender shall include a reference to the other genders.

2.7.    A reference to any Party shall include that Party's personal representatives, successors or permitted assigns.

2.8.    A reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time.

2.9.    A reference to writing or written includes email and fax.

2.10.   Any words following the terms including, include, in particular, for example or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

2.11.   A reference to this Agreement or to any other agreement or document referred to in this Agreement is a reference to this Agreement or such other agreement or document as varied or novated from time to time.



**CONTRIBUTION FORM**

This Contribution Form is to be completed by a prospective Contributor who wishes to make a contribution to the Company for the purchase of RIF in the Token Sale.

The Contribution Form together with the Agreement Details, the General T&Cs and the Schedules enclosed herewith collectively constitute the Agreement and set out the terms on which the Contributor agrees to make a contribution to the Company for the purchase of RIF in the Token Sale.

| Item | Value | Instructions / Comments |
|---|---|---|
| **Contributor Name** | SDN LTD | This name needs to match the name you used in your KYC form. |
| **Maximum Contribution Amount** | **200 BTC** | Maximum contribution amount we can allocate to you, stated in BTC. |
| **Expected Contribution Amount from you** | 200 BTC | The expected contribution amount is the amount you expect to contribute. **This amount shall be less or equal than the "Maximum Contribution Amount" stated in the row above.** If a contribution is to be made in ETH, the BTC equivalent amount of the contribution shall be calculated in accordance with clause 1.2 of the General T&Cs. If the Company receives a contribution that exceeds the Maximum Contribution Amount, we shall return to the Contributor the portion of the contribution that is in excess of the Maximum Contribution Amount, less applicable transaction fees and administrative expenses incurred by the Company in processing the return of the excess amount. Please note that it may take several days for the Company to process the return of the excess amount to the Contributor. We therefore highly recommend not exceeding the Maximum Contribution Amount. |
| **Wallet address from which contribution shall be made ("Source Wallet Address")** | 12wiE2yVGAsYi5Ncdo5L1ZppN69wEDAs7n | Please insert the address (BTC or ETH as appropriate) from where you expect to send the contribution. Contributions must be sent from a single BTC Compatible Wallet or ETH Compatible Wallet as described in clause 3 of the General T&Cs. The Source Wallet will be used to procure the issue and delivery of RIF to the Contributor's ITA Wallet through the Smart Contract System by signing a cryptographic message that will trigger smart contract operation pursuant to which RIF shall be delivered to the Contributor's ITA Wallet, as further described in clause 5 of the General T&Cs. **You should make sure you keep full access to and control of your Source Wallet until the RIF have been delivered. Failure to comply with the terms of this Agreement relating to the methods of contribution and process for procuring the issue and delivery of RIF, might render the whole transaction void and/or may put your contribution or your receipt of RIF at risk.** |
| **TEST message\*** | | In order to avoid problems in verifying contributions through the Redemption Process or Contingent Redemption Process described in clause 5 of the General T&Cs, we have set up a test process allowing Contributors to test the mechanism to verify the contribution. This is an optional process which has no implications on your rights under the Agreement. To participate in the test process, the Contributor shall be required to generate and sign a "Test Message" using the Contributor's Source Wallet. We recommend that you use the text "RIFBYRSK" (without quotes) for the purposes of the Test Message but you can also decide to use your own unique text for the purposes of the Test Message and insert such text in the field above. **FIND DETAILED INSTRUCTIONS IN THE LINKS PROVIDED BELOW.** |
| **Email address for receipt of notices** | YS54321@Yandex.ru | Please enter the email you want to use for further communications regarding your contribution. |

**\* STEP BY STEP INSTRUCTIONS FOR TEST MESSAGE CAN BE FOUND ON THE FOLLOWING LINKS:**

TEST Message Instructions for LedgerNanoS-BTC.pdf

TEST Message Instructions for LedgerNanoS-ETH.pdf

TEST Message Instructions for TrezorOne-BTC.pdf

TEST Message Instructions for TrezorOne-ETH.pdf



**Additional section only applicable to corporate entities:**

| Item | Value | Instructions / Comments |
|---|---|---|
| **Corporate Legal status** | PLEASE COMPLETE | e.g.: limited liability company, partnership, PLC, foundation, other. |
| **Country of incorporation** | Cayman Is. | Pre-filled information based on submitted KYC form. Review and modify as needed. |
| **Registered office address** | Trident Trust Company (Cayman) Ltd, Fourth Floor, One Capital Place, PO Box 847, Grand Cayman, KY1-1103, Cayman Islands | Pre-filled information based on submitted KYC form. Review and modify as needed. |
| **Name of representative with authority to bind the Contributor** | Yury Smolyar | Pre-filled information based on submitted KYC form. Review and modify as needed. |

**The table below will be filled by RIF Labs once we receive your contribution:**

| Item | Value | Instructions / Comments |
|---|---|---|
| **Initial RIF Allocation** | 2,800,000 (2.8 million) | This amount will be completed by RIF Labs once we receive your contribution and will be calculated as stated in section 1.1 of the ECA. |

The Agreement shall be deemed to come into force on the date on which the Company countersigns this Contribution Form.

Signed by a duly authorised signatory for and on behalf of  SDN LTD

Signed by a duly authorised signatory for and on behalf of **RIF LABS LIMITED**

*Yury Smolyar*
284F075119E6466

*[signature]*
8EAC899398FA44A

Signature

Signature

Yury Smolyar
…………………………………………

Alex Aberg Cobo
…………………………………………

Name

Name

President
…………………………………………

Director
…………………………………………

Position

Position

6/15/2018
…………………………………………

6/20/2018
…………………………………………

Date

Date

41