Ievgeniia P. Vatrenko, Esq.
2 Northside Piers
Brooklyn, New York 11249
(718) 451-6384
jenny@vatrenkoesq.com

*Attorney for Plaintiffs SDN Limited
and Steven Nerayoff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SDN LIMITED and STEVEN NERAYOFF,<br><br>                              Plaintiffs,<br><br>v.<br><br>IOV LABS LIMITED, RIF LABS LIMITED, RSK LABS LIMITED, DIEGO GUTIERREZ ZALDIVAR, and ALEJANDRO MARIA ABERG COBO a/k/a ALEX COBO,<br><br>                              Defendants. | Case No. 2:24-cv-06089-JMA-AYS |

**MEMORANDUM OF LAW IN OPPOSITION TO IOV LABS LIMITED,
RIF LABS LIMITED, AND RSK LABS LIMITED'S MOTION
<u>TO DISMISS AND COMPEL ARBITRATION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF RELEVANT FACTS..................................................................3

    I.     The Parties and the RIF Token Project .....................................................3

    II.    Defendants Solicit Nerayoff's Investment Through Contacts in New York .......4

    III.   The May 2018 Consensus Conference and Zaldivar's Fraudulent
          Representations in New York ...................................................................4

    IV.   Nerayoff's Reliance and Investment Decision ..........................................6

    V.    The Alleged Early Contribution Agreement ............................................6

    VI.   Nerayoff's Continuous Ownership of SDN and Lack of Any Agency
          Relationship .............................................................................................7

    VII.  The Fraud Unfolds: False Representations and Resulting Losses .....................8

    VIII. Procedural History....................................................................................9

ARGUMENT ......................................................................................................9

    I.     THE ARBITRATION CLAUSE CANNOT COMPEL NON-PARTIES
          TO ARBITRATE. ..................................................................................9

          A. Neither Plaintiff Is a Party to the ECA. ...........................................10

          B. The Arbitrator Cannot Decide Arbitrability for Nonparties. .............13

          C. Equitable Estoppel Cannot Bind Plaintiffs. .....................................14

          D. Nerayoff Has Standing as a Fraud Victim. ......................................15

    II.    THE COURT HAS PERSONAL JURISDICTION. ..........................................15

          A. Defendants Are Subject to Personal Jurisdiction Pursuant to CPLR § 302........16

          B. Due Process Is Satisfied. ..................................................................19

          C. Forum Non Conveniens Does Not Warrant Dismissal. .....................20

    III.   THE AMENDED COMPLAINT STATES VIABLE CLAIMS AND IS
          NOT FUTILE.........................................................................................22

A. The Fraud Claims Are Pleaded with Particularity Under Rule 9(b). .................23

B. The Unjust Enrichment Claim Is Neither Duplicative Nor Barred....................31

C. The Accounting Claim States a Valid Cause of Action. ....................................35

**IV. PLAINTIFFS' CLAIMS ARE TIMELY.**................................................................40

**CONCLUSION** .............................................................................................................41

# TABLE OF AUTHORITIES

**CASES**

*Allstate Ins. Co. v. Lyons*,
   843 F. Supp. 2d 358 (E.D.N.Y. 2012) ........................................................................................ 32

*Allstate Ins. Co. v. Nazarov*,
   No. 11-CV-6187, 2015 WL 5774459 (E.D.N.Y. Sept. 30, 2015) ............................................. 32

*Asahi Metal Indus. Co. v. Cal. Super. Ct., Solano Cnty.*,
   480 U.S. 102 (1987) ................................................................................................................. 19

*Asdourian v. Konstantin*,
   77 F. Supp. 2d 349 (E.D.N.Y. 1999) ....................................................................................... 23

*Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*,
   543 B.R. 78 (Bankr. S.D.N.Y. 2016) ................................................................................. 35, 37

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   305 F.3d 120 (2d Cir. 2002) .................................................................................................... 20

*Barrows v. Brinker Rest. Corp.*,
   36 F.4th 45 (2d Cir. 2022) .................................................................................... 1, 10, 11, 13

*Bayley v. Bethpage Federal Credit Union*,
   No. 21-CV-5821, 2024 WL 5105552 (E.D.N.Y. Dec. 13, 2024) .............................................. 33

*Beecher v. Able*,
   374 F. Supp. 341 (S.D.N.Y. 1974) .......................................................................................... 25

*Bialek v. Racal-Milgo, Inc.*,
   545 F. Supp. 25 (S.D.N.Y. 1982) ............................................................................................ 18

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) .................................................................................................... 26

*Carbon Inv. Partners, LLC v. Bressler*,
   No. 20-CV-3617, 2021 WL 3913526 (S.D.N.Y. Sept. 1, 2021) .............................................. 31

*Cohen v. Koenig*,
   25 F.3d 1168 (2d Cir. 1994) .................................................................................................... 24

*Crivellaro v. Singularity Future Tech. Ltd.*,
   No. 22-CV-07499, 2024 WL 5146051 (E.D.N.Y. Dec. 17, 2024) ........................................... 30

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
   7 N.Y.3d 65 (N.Y. 2006) ................................................................................................... 16, 17

*Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*,
   749 F. Supp. 3d 456 (S.D.N.Y. 2024) ..................................................................................... 31

*Fourth Ave. Owners Corp. v. Douglas Elliman Prop. Mgmt.*,
   234 A.D.3d 590 (1st Dep't 2025) ............................................................................................ 36

*Gov't Emps. Ins. Co. v. Badia*,
No. 13-CV-1720, 2015 WL 1258218 (E.D.N.Y. Mar. 18, 2015) ................................................. 33

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Co.*,
415 US 423 (1974) ................................................................................................................. 41

*Harvey v. Sellers*,
115 F. 757 (C.C.S.D.N.Y. 1902) ......................................................................................... 35

*Healthwave Inc. v. New York Soc'y. for the Relief of the Ruptured & Crippled Maintaining the Hosp. for Special Surgery*, 99 A.D.3d 494 (1st Dep't 2012) ............................................................ 26

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ................................................................................................................ 13

*Hines v. Overstock.com, Inc.*,
380 F. App'x 22 (2d Cir. 2010) ............................................................................................ 10

*Humitech Dev. Corp. v. Comu*,
16 Misc. 3d 1109(A), 2007 WL 2004175 (Sup. Ct. N.Y. Cnty. 2007) ...................... 17, 18

*Iannuzzi v. Am. Mortg. Network, Inc.*,
727 F. Supp. 2d 125 (E.D.N.Y. 2010) ................................................................................ 12

*Idrees v. Am. Univ. of the Caribbean*,
546 F. Supp. 1342 (S.D.N.Y. 1982) .................................................................................... 25

*In re Koreag, Controle et Revision S.A.*,
961 F.2d 341 (2d Cir. 1992) ................................................................................................ 34

*In re Nigeria Charter Flights Cont. Litig.*,
520 F. Supp. 2d 447 (E.D.N.Y. 2007) ................................................................................ 12

*In re Skat Tax Refund Scheme Litig.*,
356 F. Supp. 3d 300 (S.D.N.Y. 2019) ................................................................................ 33

*In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*,
230 F. Supp. 2d 403 (S.D.N.Y 2002) .................................................................................. 15

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) .................................................................................................... 24

*Ipcon Collections LLC v. Costco Wholesale Corp.*,
698 F.3d 58 (2d Cir. 2012) .................................................................................................. 28

*JL Collier Corp. v. Wells Fargo Bank, N.A.*,
127 A.D.3d 1026 (2d Dep't) ................................................................................................ 40

*Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*,
186 F.3d 210 (2d Cir. 1999) ................................................................................................ 13

*KPMG LLP v. Kirschner*,
182 A.D.3d 484 (1st Dep't 2020) ........................................................................................ 14

iv

*KTV Media Int'l, Inc. v. Galaxy Grp.*,
   812 F. Supp. 2d 377 (S.D.N.Y. 2011), ............................................................................ 21

*Kulak v. City of New York*,
   88 F.3d 63 (2d Cir. 1996) ............................................................................................... 10

*L & R Exploration Venture v. Grynberg*,
   22 A.D.3d 221 (1st Dep't 2005), *lv denied* 6 N.Y.3d 749 (N.Y. 2005) ........................ 17

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161(2d Cir. 2005) ............................................................................................ 30

*LibertyPointe Bank v. 75 E. 125th St., LLC*,
   95 A.D.3d 706 (1st Dep't 2012) ..................................................................................... 26

*Lojewski v. Grp. Solar USA, LLC*,
   2023 WL 5301423 (S.D.N.Y. Aug. 17, 2023) ............................................................... 14

*Luckern v. Lyonsdale Energy Ltd. P'ship*,
   229 A.D.2d 249 (4th Dep't 1997) ................................................................................... 40

*McKee Elec. Co. v. Rauland-Borg Corp.*,
   20 N.Y.2d 377 (1967) ..................................................................................................... 16

*Meghji v. Castel et al. (In re Celsius Network LLC)*,
   669 B.R. 108 (Bankr. S.D.N.Y. 2025) ..................................................................... 38, 40

*Meghji v. Falba et al. (In re Celsius Network LLC)*,
   No. 22-AP-10964, 2025 WL 2211847 (Bankr. S.D.N.Y. Aug. 5, 2025) ........................ 37

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp.*,
   19 A.D.3d 273 (1st Dep't 2005) ..................................................................................... 26

*Mfrs. Hanover Trust Co. v. Yanakas*,
   7 F.3d 310 (2d Cir.1993) ................................................................................................ 26

*Minnie Rose LLC v. Yu*,
   169 F. Supp. 3d 504 (S.D.N.Y. 2016) ........................................................................... 23

*Moore v. PaineWebber, Inc.*,
   189 F.3d 165 (2d Cir. 1999) ........................................................................................... 23

*Moss v. BMO Harris Bank, N.A.*,
   258 F. Supp. 3d 289 (E.D.N.Y. 2017) ........................................................................... 33

*Mueller v. Michael Janssen Gallery PTE. Ltd.*,
   225 F. Supp. 3d 201 (S.D.N.Y. 2016) ........................................................................... 31

*Pilon v. Discovery Commc'ns, LLC*,
   769 F. Supp. 3d 273 (S.D.N.Y. 2025) ........................................................................... 14

*Rabinowitz v. Kelman*,
   75 F.4th 73 (2d Cir. 2023) .............................................................................................. 21

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................................... 29

*Rostami v. Open Props, Inc.*,
    No. 22-CV-3326, 2023 WL 137748 (S.D.N.Y. Jan. 9, 2023) ................................................. 27, 29

*Sergeants Benevolent Ass'n Annuity Fund v. Renck*,
    19 A.D.3d 107 (1st Dep't 2005) ........................................................................................ 32

*Silvercreek Mgmt. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ............................................................................... 31

*Stevens & Co., LLC v. Espat*,
    No. 24-CV-5223, 2024 WL 4593645 (S.D.N.Y. Oct. 28, 2024) ....................................... 40, 41

*Thomson–CSF, S.A. v. Am. Arbitration Ass'n*,
    64 F.3d 773 (2d Cir. 1995) ............................................................................................. 9, 21

*Time Warner City Cable v. Adelphi Univ.*,
    27 A.D.3d 551 (2d Dep't 2006) ................................................................................. 11, 12, 13

*Todd v. Pearl Woods, Inc.*,
    20 A.D.2d 911 (2d Dep't 1964), *aff'd*, 15 N.Y.2d 817 (N.Y. 1965) .................................. 27

*Townsend v. John B. Carter Co.*,
    165 A.D. 973 (1st Dep't 1914) ........................................................................................ 35

*Trophy Depot, Inc. v. Awards Depot Inc.*,
    No. 15-CV-4103, 2016 WL 11509911 (E.D.N.Y. July 5, 2016) ................................. 15, 16, 19, 20

*Trump v. Simon & Schuster, Inc.*,
    791 F. Supp. 3d 470 (S.D.N.Y. 2025) ............................................................................. 40

*Uhlman v. New York Life Ins. Co.*,
    109 N.Y. 421 (1888) ...................................................................................................... 35

*United Artists Theatre Cir., Inc. v. Sun Plaza Enter. Corp.*,
    352 F. Supp. 2d 342 (E.D.N.Y. 2005) ............................................................................. 26

*United States Sec. & Exch. Comm'n v. Collector's Coffee, Inc.*,
    697 F. Supp. 3d 138 (S.D.N.Y. 2023) ............................................................................. 25

*United States v. Schlisser*,
    No. 03-CR-611, 2004 WL 736900 (S.D.N.Y. Apr. 6, 2004) ........................................... 24

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960) ................................................................................................ 9, 13, 21

*Watts v. Jackson Hewitt Tax Serv. Inc.*,
    579 F. Supp. 2d 334 (E.D.N.Y. 2008) ............................................................................. 28

*Woods v. Maytag Co.*,
    807 F. Supp. 2d 112 (E.D.N.Y. 2011) ............................................................................. 29

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ...................................................................................................... 20

vi

*Yuille v. Uphold HQ Inc.*,
   686 F. Supp. 3d 323 (S.D.N.Y. 2023) ................................................................................ 29

**OTHER AUTHORITIES**

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. II, ¶ 1 ............................... 13

**RULES**

CPLR 3012(b) ........................................................................................................................ 40, 41

CPLR § 302(a) ................................................................................................... 16, 17, 18, 19

CPLR 305(c) ........................................................................................................................ 40

Fed. R. Civ. P. 12(b) .......................................................................................................... 15, 22

Fed. R. Civ. P. 8(a) ............................................................................................................. 32, 38

Fed. R. Civ. P. 9(b) ............................................................................................................. 23

**TREATISES**

1 N.Y. JUR. 2D ACCOUNTS AND ACCOUNTING § 34 ................................................... 37

Restatement (Third) of Agency § 3.01 ............................................................................. 11

Plaintiffs SDN Limited and Steven Nerayoff respectfully submit this memorandum of law in opposition to Defendants' motion to compel arbitration and dismiss the Complaint and First Amended Complaint (the "Motion").

## PRELIMINARY STATEMENT

Defendants' motion to compel arbitration rests on a fiction: that Plaintiffs agreed to arbitrate their claims. They did not. The Early Contribution Agreement ("ECA") that Defendants invoke bears the signature of "Yury Smolyar," a person unknown to Plaintiffs, and not the signature of either Steven Nerayoff or SDN Limited. Under sworn declaration, Nerayoff categorically denies ever signing the ECA, ever authorizing anyone to sign it on his or SDN's behalf, and ever even seeing the arbitration provision until this litigation. (Nerayoff Decl. ¶¶ 2-5, 8-9.) Under Second Circuit precedent in *Barrows v. Brinker Restaurant Corp*., such specific denials made under penalty of perjury are "independently sufficient to raise a genuine issue of material fact" and defeat a motion to compel arbitration at this stage. 36 F.4th 45, 51-52 (2d Cir. 2022).

Defendants attempt to sidestep this fundamental problem by claiming that SDN ownership transferred to Yury Smolyar before the ECA was signed. But Defendants' "evidence" of this alleged transfer consists solely of third-party statements: a letter from MF Tax Group and a declaration from that firm's former partner, Alex Feldman, neither of whom ever had authority to speak for or bind SDN or Nerayoff. Nerayoff unequivocally denies under oath that any ownership transfer occurred, that he authorized these parties to act for SDN, or that he ever communicated any such authority to Defendants. (Nerayoff Decl. ¶¶ 6-7, 10-11, 18-21.) Without any manifestation of consent from the actual principal – the bedrock requirement of agency law – these third-party statements cannot bind SDN to an arbitration agreement it never authorized.

1

The substantive fraud allegations further demonstrate why this case must proceed in this Court. In early 2018, Defendants embarked on an elaborate scheme to induce Nerayoff, a prominent advisor to the Ethereum Foundation, to invest approximately $176 million worth of bitcoin in their RIF token project. Through in-person meetings in New York, direct communications to Nerayoff in New York, and targeted solicitations, Defendants made a series of false representations designed to secure his investment: that the RIF blockchain was a "fully functional" second-layer solution for Bitcoin with Ethereum-style smart contract capabilities; that strategic partnerships existed to support the RIF ecosystem; that investor funds would be used exclusively to develop and promote the RIF blockchain; and that numerous developers were ready to build applications on the platform.

These representations were knowingly false. After the token launch, it became clear that the RIF blockchain lacked the promised functionality, the touted partnerships never existed, and investor funds were diverted away from blockchain development, including to purchase an unrelated Argentinian social media company, Taringa. As the fraud unraveled, RIF tokens lost approximately 90% of their value, resulting in catastrophic losses to Plaintiffs.

Defendants now seek to avoid accountability for this fraud by hiding behind an arbitration agreement that Plaintiffs never signed and to which they never agreed. The law does not permit parties to impose arbitration on non-signatories through fabricated agency relationships. Defendants' motion should be denied.

Defendants' remaining arguments likewise fail. This Court has personal jurisdiction over Defendants based on their deliberate contacts with New York in soliciting and defrauding a New York resident. Their statute of limitations argument ignores controlling law establishing that Plaintiffs timely commenced this action by filing a summons with notice in New York state court

on May 3, 2024. And their challenges to the sufficiency of the pleadings are meritless, given that Plaintiffs have alleged fraud with the requisite particularity and have stated viable claims for unjust enrichment and accounting based on Defendants' misappropriation of investor funds.

For the reasons set forth in this memorandum and in Nerayoff's sworn declaration, Defendants' motion should be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

### I.  THE PARTIES AND THE RIF TOKEN PROJECT

Plaintiff Steven Nerayoff is a New York resident who, at all relevant times, resided in Nassau County, New York. (Am. Compl. ¶ 3; Nerayoff Decl. ¶ 1.) Nerayoff is a prominent consultant in the cryptocurrency and blockchain industries, well known in the blockchain community for his advisory role in the launch of Ethereum Network's ether token. (Am. Compl. ¶ 15.) He is the President and sole owner of Plaintiff SDN Limited, a Cayman Islands company bearing his initials. (Am. Compl. ¶¶ 3, 15; Nerayoff Decl. ¶ 6.)

Defendants RSK Labs Limited ("RSK"), IOV Labs Limited ("IOV"), and RIF Labs Limited (collectively, "RootstockLabs") are blockchain technology companies. (Am. Compl. ¶¶ 4-5.) RSK was founded in 2015 and initially focused on developing a Bitcoin "side-chain" technology. (Am. Compl. ¶¶ 11-12.) By late 2017 and early 2018, RSK was planning a token pre-sale and public launch for what it called "RIF Tokens," which would supposedly provide access to applications built on the RSK Infrastructure Framework Open Standard Protocols ("RIFOS"). (Am. Compl. ¶ 16.)

Defendant Diego Gutierrez Zaldivar was, at all relevant times, the Chief Executive Officer of RSK and a Director of IOV. (Am. Compl. ¶ 6.) Defendant Alejandro Maria Aberg Cobo was an advisor to RSK and a Director of IOV. (Am. Compl. ¶ 7.)

3

## II.   DEFENDANTS SOLICIT NERAYOFF'S INVESTMENT THROUGH CONTACTS IN NEW YORK

Nerayoff was first introduced to Zaldivar and other RSK employees via email in December 2017, when RSK was planning its token pre-sale and public launch. (Am. Compl. ¶ 16.) Thereafter, Zaldivar, Cobo, and other RSK representatives began actively soliciting Nerayoff's investment in the RIF token pre-sale. (Am. Compl. ¶ 17.) On February 11, 2018, knowing that Mr. Nerayoff resided in New York, Zaldivar wrote to him confirming that RSK wanted his participation as an investor. (Am. Compl. ¶ 17.)

On March 24, 2018, RSK sent Nerayoff an email with the subject line: "Your exclusive invitation to participate in the RSK Infrastructure Framework Token private sale." (Am. Compl. ¶ 18.) The email stated that RSK was "excited to . . . have [Nerayoff] onboard as a strategic contributor," explicitly framing the transaction as an investment opportunity rather than a mere purchase of utility tokens. (Am. Compl. ¶ 18; Nerayoff Decl. ¶¶ 21-25.)

## III.   THE MAY 2018 CONSENSUS CONFERENCE AND ZALDIVAR'S FRAUDULENT REPRESENTATIONS IN NEW YORK

In May 2018, Nerayoff attended the leading cryptocurrency industry Consensus conference held in New York City from May 14-16, 2018. (Am. Compl. ¶ 19; Nerayoff Decl. ¶ 26.) On May 15, 2018, Defendant Zaldivar met with Nerayoff in New York. (Am. Compl. ¶ 19; Nerayoff Decl. ¶ 26.) At this in-person meeting in New York, Zaldivar solicited Nerayoff to invest in RIF tokens and made material representations about the RIF token offering. (Nerayoff Decl. ¶¶ 27-28.)

Specifically, at the New York meeting and in surrounding communications, Zaldivar and other Defendants made the following false representations to Nerayoff:

a.   That the RIF blockchain was a "fully functional" second-layer blockchain solution that would be launched on the Bitcoin network with the then-existing ability to provide

Ethereum-style smart contract capabilities and other functionality to the Bitcoin blockchain (Am. Compl. ¶¶ 1, 20-23; Nerayoff Decl. ¶¶ 28, 31);

b.  That strategic partnerships existed to support and add value to the RIF ecosystem, including a partnership with Bitclub Network (Am. Compl. ¶¶ 1, 24-27; Nerayoff Decl. ¶ 31(a));

c.  That funds raised in the RIF token pre-sale would be used exclusively to promote the RIF blockchain and develop its operating system protocol (Am. Compl. ¶¶ 1, 24; Nerayoff Decl. ¶ 31(b));

d.  That numerous developers around the world were ready to build applications on the RIF blockchain (Am. Compl. ¶¶ 1, 25; Nerayoff Decl. ¶ 31(c)); and

e.  That the RIF tokens would appreciate in value once the RIF blockchain was fully developed and promoted using the token sale proceeds (Am. Compl. ¶ 24; Nerayoff Decl. ¶¶ 23, 31(e)).

At the time Zaldivar met with Nerayoff in New York on May 15, 2018, Zaldivar knew that Nerayoff was located in New York and that he was soliciting a New York investor. (Nerayoff Decl. ¶ 29.) Critically, at this time, Nerayoff had not transferred ownership of SDN to anyone, and SDN remained under his sole ownership and control. (*Id*. ¶ 30.)

Defendants solicited Nerayoff as a "strategic contributor" and "investor," not as a future user of network services. (*Id*. ¶¶ 21-22.) Defendants represented that Nerayoff would be investing in RIF tokens with the expectation that the tokens would appreciate in value. (*Id*. ¶ 23.) At no time did Defendants represent that Nerayoff was simply pre-purchasing utility services or network functionality. (*Id*. ¶ 24.)

Defendants' own expressed concerns about selling RIF tokens to U.S. persons due to securities regulatory issues belies their current characterization of RIF tokens as mere "utility

tokens." (*Id*. ¶¶ 36-38.) If these were truly utility tokens for pre-purchasing network services, there would have been no regulatory concerns about U.S. purchasers. (*Id*. ¶ 38.) Instead, Defendants understood they were offering investment securities, which is why they expressed reluctance about transacting with U.S. investors. (*Id*. ¶ 37.)

## IV.  NERAYOFF'S RELIANCE AND INVESTMENT DECISION

Nerayoff relied on Defendants' material misrepresentations in deciding to invest in RIF tokens. (*Id*. ¶ 32.) Based on these fraudulent representations, particularly the representations made during the May 15, 2018 meeting in New York, Nerayoff decided to invest approximately $176 million worth of bitcoin in RIF tokens personally and through SDN Limited. (Am. Compl. ¶ 28; Nerayoff Decl. ¶ 32.) Had Nerayoff known the truth about the RIF blockchain's lack of functionality, the non-existent strategic partnerships, and Defendants' plans to misuse investor funds, he would not have made this investment. (Nerayoff Decl. ¶ 35.)

## V.  THE ALLEGED EARLY CONTRIBUTION AGREEMENT

Defendants now claim that on June 15, 2018, an entity purporting to be SDN executed an Early Contribution Agreement ("ECA") to purchase RIF tokens, and that this agreement contained an arbitration provision. The signature on the ECA is not Nerayoff's signature, however. It purports to be from someone named "Yury Smolyar." (Nerayoff Decl. ¶ 3.)

Nerayoff categorically denies the following under penalty of perjury:

   a.   He has never signed the ECA. (*Id*. ¶ 2.)

   b.   He did not see the ECA until this litigation. (*Id*. ¶ 4.)

   c.   He did not see the arbitration provision in the ECA until this litigation. (*Id*. ¶ 5.)

   d.   He does not know who Yury Smolyar is. (*Id*. ¶ 3.)

6

    e.  He has never authorized anyone, including Yury Smolyar, MF Tax Group, or Alex Feldman, to sign agreements on behalf of SDN Limited. (*Id*. ¶ 8.)

    f.  He has never authorized anyone to act as an agent for SDN in executing the ECA or any other agreement with Defendants. (*Id*. ¶ 9.)

    g.  He has never communicated to any of the Defendants that MF Tax Group or Alex Feldman had authority to act on his behalf or on behalf of SDN. (*Id*. ¶ 10.)

    h.  He has never communicated to Defendants that any transfer of SDN ownership had occurred or would occur. (*Id*. ¶ 11.)

## VI.  NERAYOFF'S CONTINUOUS OWNERSHIP OF SDN AND LACK OF ANY AGENCY RELATIONSHIP

Nerayoff is, and at all times relevant to this action has been, the sole owner of SDN Limited. (*Id*. ¶ 6.) He has never transferred ownership of SDN to anyone, including Yury Smolyar or any other person or entity. (*Id*. ¶ 7.) Neither SDN nor Nerayoff personally were ever clients of MF Tax Group. (*Id*. ¶ 12.) Nerayoff never gave MF Tax Group or Feldman authority to bind SDN or him to any agreements or obligations. (*Id*. ¶¶ 13-14.) He has never ratified, approved, or consented to any actions taken by MF Tax Group, Alex Feldman, or Yury Smolyar with respect to the ECA or any other agreement with Defendants. (*Id.* ¶ 15.)

Defendants have submitted a letter purportedly from MF Tax Group dated May 23, 2018, which falsely claims that SDN ownership was transferred to Yury Smolyar. (*Id.* ¶ 16.) Nerayoff did not see this letter until Defendants provided it to his prior counsel in November 2024. (*Id.* ¶ 17.) He did not authorize MF Tax Group to prepare or send such a letter. (*Id.* ¶ 18.) He did not request that Alex Feldman prepare such a letter on behalf of SDN or on his behalf. (*Id.* ¶ 19.)

The representation in the MF Tax Group letter that SDN ownership was transferred to Yury Smolyar is categorically false. No such transfer ever occurred. (*Id.* ¶ 20.) Nerayoff never consented to any representation that SDN ownership had been transferred. (*Id.* ¶ 21.)

## VII.  THE FRAUD UNFOLDS: FALSE REPRESENTATIONS AND RESULTING LOSSES

After making his investment, Nerayoff discovered that many of the representations Defendants made to him were false. The claimed strategic partnerships either did not exist or did not provide the support and value that Defendants represented. (*Id.* ¶ 33(a).) For example, the purported partnership with Bitclub Network was never announced because it never existed. (Am. Compl. ¶ 1.) Investor funds were not used as represented for development of the RIF blockchain and technology. (Nerayoff Decl. ¶ 33(b).) Instead, upon information and belief, Defendants diverted investor funds to their principals and to purchase Taringa, an unrelated Argentinian social media company. (Am. Compl. ¶¶ 1, 24.) The number and involvement of developers working on the RIF project was materially less than represented. (Nerayoff Decl. ¶ 33(c).) The technical functionality of the RIF blockchain was materially less than what Defendants represented it was. (*Id.* ¶ 33(d).) Most significantly, the RIF token was launched on the Ethereum network. (Am. Compl. ¶ 1.)

At the time Defendants made these representations to Nerayoff, including during the critical May 15, 2018 meeting in New York, they knew or recklessly disregarded that these representations were false or misleading. (Nerayoff Decl. ¶ 34; Am. Compl. ¶¶ 38-39, 48-49.) As a result of Defendants' fraud and the revelation of these falsehoods, RIF tokens lost approximately 90% of their value. (Nerayoff Decl. ¶ 33(e); Am. Compl. ¶ 1.) This loss in value was directly caused by the disclosure and realization that Defendants' representations about strategic

partnerships, use of investor funds, developer involvement, and blockchain functionality were false. (Nerayoff Decl. ¶¶ 40-41.)

## VIII.   PROCEDURAL HISTORY

On May 3, 2024, Plaintiffs commenced this action by filing a summons with notice in New York Supreme Court, Nassau County. This filing commenced the action for statute of limitations purposes under CPLR 305(c).

On August 30, 2024, Defendants removed the case to this Court. (ECF 1.) Following removal, on September 19, 2024, Defendants demanded that Plaintiffs serve a complaint within twenty days. (ECF 8.) However, by removing the case to this Court and thereby invoking federal procedural rules, Defendants could no longer invoke the state court procedural rule CPLR 3012(b)'s twenty-day time limit for service of the complaint following such a demand.

Plaintiffs filed their Complaint in this Court on November 5, 2024 (ECF 21), within a reasonable time after removal. Plaintiffs subsequently sought leave to file an Amended Complaint, which has been fully briefed and is pending before the Court concurrently with this motion.

## ARGUMENT

## I.   THE ARBITRATION CLAUSE CANNOT COMPEL NON-PARTIES TO ARBITRATE.

It is black-letter law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). Defendants' arbitration argument rests entirely on a contract that neither Plaintiff signed, agreed to, or even saw. This fundamental defect is fatal to their motion to compel arbitration.

9

When moving to compel arbitration, "the party seeking . . . arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citing *Hines v. Overstock.com, Inc*., 380 F. App'x 22, 24 (2d Cir. 2010)). Upon showing that an agreement to arbitrate existed, opposing party must counter with at least "some evidence . . . to substantiate her denial" that an agreement had been made. *Id.* In reviewing motions to compel arbitration, just as for motions for summary judgment, a court must "consider *all* relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with *affidavits*." *Barrows*, 36 F.4th at 50 (emphasis in original). In deciding a motion to compel arbitration, as for a summary judgment motion, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Id.* at 54 (citing *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

### A.  Neither Plaintiff Is a Party to the ECA.

The threshold issue is dispositive: neither Nerayoff nor SDN signed the ECA. The document Defendants proffer bears the signature of "Yury Smolyar," not Plaintiffs. (Ex. A.)

Nerayoff categorically denies: (1) signing any agreement with Defendants; (2) transferring SDN ownership to anyone; (3) authorizing anyone to sign agreements on SDN's behalf; and (4) seeing the arbitration provisions Defendants now invoke. (Nerayoff Decl. ¶¶ 2, 5, 7-9.) Under this Circuit's precedent in *Barrows*, Nerayoff's declaration squarely defeats the motion to compel arbitration. *Barrows*, 36 F.4th at 51. In *Barrows*, the Second Circuit reversed a district court's order compelling arbitration where, like here, the movant employer produced an arbitration agreement bearing what appeared to be the non-movant employee's electronic signature, but the employee submitted a sworn declaration categorically denying she had ever signed it. *Id.* at 51-52. The Court held that when a plaintiff makes "specific and exacting" denials under penalty of

perjury, stating she never completed electronic paperwork, never used the employer's systems, never heard of the signature platform, and never signed the agreement, such "detailed accounting, submitted under oath, is surely 'some evidence' that she did not agree to arbitration." *Id.* at 52. Critically, the Court emphasized that a nonmovant's sworn declaration "alone" can be "independently sufficient to raise a genuine issue of material fact," and that disregarding such evidence would improperly "thrust the courts – at an inappropriate stage – into an adjudication of the merits." *Id.* at 51.

Here, Nerayoff's declaration is even stronger than the one in *Barrows*: not only does he categorically deny signing the ECA or authorizing anyone to sign on his behalf, but Defendants themselves acknowledge that the signature on the document is not Nerayoff's and belongs to "Yury Smolyar," whom Defendants claim (without proof) acquired SDN ownership.

Defendants' reliance on the MF Tax Group letter and Feldman affidavit to bind SDN to the ECA fails as a matter of agency law. While Defendants present a letter from MF Tax Group claiming that SDN ownership was transferred to Yuri Smolyar (Ex. C), and Feldman's declaration that Nerayoff asked him to prepare such a letter (Feldman Decl. ¶ 6), these documents cannot establish that SDN is bound by Smolyar's signature on the ECA.

Under fundamental principles of agency law, an agent cannot bind a principal without the principal's manifestation of consent. *Restatement (Third) of Agency* § 3.01 ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf"); *Time Warner City Cable v. Adelphi Univ.*, 27 A.D.3d 551, 552 (2d Dep't 2006) ("A principal-agent relationship may be established by evidence of the 'consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act . . . The agent is a party who acts on behalf

of the principal with the latter's express, implied, or apparent authority.'"); *In re Nigeria Charter Flights Cont. Litig.*, 520 F. Supp. 2d 447, 463 (E.D.N.Y. 2007) ("Apparent authority exists only where 'words or conduct of the principal, communicated to a third party . . . give rise to the appearance and belief that the agent possesses authority to enter into a transaction.'").

Here, Nerayoff, SDN's sole owner, has never manifested any intent to be bound by actions taken by MF Tax Group, Feldman, or Smolyar. He never expressly told Defendants that MF Tax Group or Feldman had authority to act on his or SDN's behalf. He never communicated to Defendants that any ownership transfer occurred. Most critically, he now expressly denies under oath that: (1) any transfer of SDN ownership ever occurred; (2) he authorized anyone to sign agreements for SDN; or (3) he gave MF Tax Group or Feldman authority to bind SDN. (Nerayoff Decl. ¶¶ 7-8, 13-14, 20.) Defendants have produced no evidence – no emails, texts, or other communications from Nerayoff himself – suggesting that he ever authorized these third parties to act for SDN or ratified their actions. The only "evidence" Defendants offer is a letter from a third party (MF Tax Group) and a declaration from that third party's former partner (Feldman), neither of whom had apparent or actual authority to speak for SDN absent express authorization from Nerayoff, which he categorically denies providing. Without any manifestation of consent from the actual principal, these third-party statements cannot create an agency relationship or bind SDN to an arbitration agreement it never authorized at this stage. *See Time Warner,* 27 A.D.3d at 553 ("where the circumstances raise the possibility of a principal-agent relationship, and no written authority for the agency is established, questions as to the existence and scope of the agency must be submitted to a jury"); *Iannuzzi v. Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 140 (E.D.N.Y. 2010) (same). Defendants' production of a document bearing *someone else's* signature creates more than sufficient evidence that Plaintiffs never agreed to arbitrate and, at best, creates an issue

of fact as to whether a principal-agent relationship existed. Under *Barrows* and *Time Warner*, Nerayoff's sworn declaration denying any agreement to arbitrate, combined with the undisputed fact that his signature does not appear on the ECA and the lack of written authorization for any alleged agent, conclusively defeats Defendants' motion to compel arbitration.

### B.  The Arbitrator Cannot Decide Arbitrability for Nonparties.

Defendants argue that the arbitrator should decide arbitrability because the ECA delegates this question to the arbitrator. This argument fails because delegation clauses, like arbitration clauses themselves, can only bind parties who agreed to them. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019), requires "clear and unmistakable" evidence that "the parties" agreed to arbitrate arbitrability; *see also United Steelworkers*, 363 U.S. at 582 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Non-parties who never signed the agreement cannot have "clearly and unmistakably" agreed to anything, and Defendants cannot manufacture an arbitration agreement by presenting a document Plaintiffs never signed.[1]

Defendants invoke the New York Convention, but this too requires an "agreement in writing" between the parties. Convention art. II, ¶ 1. The Second Circuit has held that "the Convention requires that the arbitration agreement be signed by the parties or contained in an exchange of letters or telegrams." *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 218 (2d Cir. 1999). Neither condition is met here because Plaintiffs never signed the ECA nor exchanged any written agreement to arbitrate.

---

[1] Defendants' reliance on the LCIA Rules is misplaced. Plaintiffs never agreed to the LCIA Rules because they never signed the ECA incorporating those rules.

Here, the formation of the agreement to arbitrate itself is disputed, and the court – not the arbitrator – must determine its validity. *See Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 292 (S.D.N.Y. 2025) ("the FAA does not permit the federal court to consider general challenges to contracts containing enforceable arbitration provisions, with the exception of challenges to the formation of an agreement") (internal citations and quotations omitted); *KPMG LLP v. Kirschner*, 182 A.D.3d 484, 484-85 (1st Dep't 2020) (the issue of whether a party is bound by an arbitration provision in an agreement it did not execute is a threshold issue for the court, not the arbitrator, to decide). And as Plaintiffs have demonstrated above, because there is an issue of fact as to whether they are parties to the ECA, the Court must deny Defendants' motion to compel arbitration.

## C.  Equitable Estoppel Cannot Bind Plaintiffs.

Defendants argue that Nerayoff should be estopped from avoiding arbitration because he allegedly received benefits from the ECA. This argument fails on multiple grounds.

Nerayoff did not receive RIF tokens from any transaction governed by the ECA. Although the Amended Complaint alleges that Nerayoff personally purchased RIF tokens from IOV (Am. Compl. ¶ 29(d)), he did not sign the ECA. SDN purchased tokens from third-party intermediaries selected by Defendants (*id.*  ¶¶ 26-29), not through the ECA framework. Defendants cannot identify any benefit Nerayoff received that "can be traced directly to the agreement containing the arbitration clause." *Cf. Lojewski v. Grp. Solar USA, LLC*, 2023 WL 5301423, at *12 (S.D.N.Y. Aug. 17, 2023). Nor can Defendants show Plaintiffs "knowingly exploited" an agreement they never signed, never agreed to, and whose arbitration provisions they never saw. (Nerayoff Decl. ¶¶ 2, 4-5.)

14

### D. Nerayoff Has Standing as a Fraud Victim.

Defendants argue Nerayoff lacks standing because he "did not purchase any RIF Tokens himself." This misunderstands both the facts and the law. Nerayoff was personally solicited, personally attended the Consensus Conference and in-person meeting with Zaldivar where misrepresentations were made, and personally communicated with Defendants throughout the fraudulent scheme. (Am. Compl. ¶¶ 17-23.) He has standing to sue for fraud perpetrated against him. The Amended Complaint also alleges that Nerayoff personally purchased 2,800,000 tokens for 200 bitcoin directly from IOV. (*Id.* ¶ 29(d).) Nerayoff suffered concrete injury from the fraud and has standing to sue those who defrauded him.

Defendants' motion to compel arbitration must be denied.

## II. THE COURT HAS PERSONAL JURISDICTION.

Under Rule 12(b)(2), a court must dismiss an action if the court does not have personal jurisdiction over the defendant. *Trophy Depot, Inc. v. Awards Depot Inc.*, No. 15-CV-4103, 2016 WL 11509911, at *1 (E.D.N.Y. July 5, 2016) (citing *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 406 (S.D.N.Y 2002)). "In considering the plaintiff's pleadings and evidence, the court must assume plaintiff's factual allegations are true and draw all reasonable inferences in favor of the plaintiff." *Id.* To exercise personal jurisdiction, a court must have either specific or general jurisdiction.

Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the suit arises out of or is related to the defendant's contacts with the forum state. *Id.* at *2. To determine whether a court has specific personal jurisdiction over a non-domiciliary in a federal question or diversity case, the court must ask whether: (1) the court has personal jurisdiction under

the forum state's long-arm statute; and (2) the court's assertion of personal jurisdiction comports with the Due Process Clause. *Id.* Here, both elements are satisfied.

### A. Defendants Are Subject to Personal Jurisdiction Pursuant to CPLR § 302.

#### 1. Defendants Transacted Business in New York (CPLR § 302(a)(1)).

To be subject to personal jurisdiction pursuant to CPLR 302(a)(1), a defendant must engage in purposeful business activities or transactions in New York and there must be a substantial relationship between the defendant's business activities or transactions in this State and the claims asserted in the complaint. *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (N.Y. 2006). Personal jurisdiction can be based upon a single transaction by a defendant in New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claims asserted. *Id.*

Defendants purposefully availed themselves of the privilege of conducting business in New York through systematic solicitation of New York investors, including Nerayoff. Zaldivar personally met with Nerayoff during the Consensus Conference in New York City in May 2018 to solicit investments, making specific misrepresentations about RIF blockchain functionality. (Am. Compl. ¶¶ 19-21). This was targeted solicitation of investment – not "passing the time of day," as Defendants suggest by citing *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377 (1967).[2] Defendants sent their "exclusive invitation to participate" to Nerayoff in New York, knowing his

---

[2] Even accepting Defendants' fiction that SDN ownership transferred on March 1, 2018, their jurisdictional argument still fails. Defendants admit that they did not receive notice of this alleged transfer until May 23, 2018, when MF Tax Group purportedly sent its letter. (Ex. C). Yet Zaldivar met with Nerayoff in New York on May 15, 2018, eight days before Defendants claim to have learned of any ownership change. At that meeting, Zaldivar solicited Nerayoff as a New York investor, made fraudulent representations to him in New York, and purposefully availed himself of New York's jurisdiction. Defendants' own timeline confirms that Zaldivar targeted Nerayoff as a New York investor when making the fraudulent representations that form the basis of this lawsuit.

residence. (*Id.* ¶¶ 17-18.) They continued communicating with him in New York throughout the solicitation process. (*Id.* ¶ 23.) Zaldivar texted Nerayoff in New York confirming that he "preserved allocation" for Plaintiffs' investment (*id.* ¶ 27), demonstrating ongoing business dealings directed at New York. Plaintiffs' investment in RIF tokens, discussed in the parties' meetings and communications, is now the subject of this litigation. These contacts establish the "purposeful availment" of New York. *Humitech Dev. Corp. v. Comu*, 16 Misc. 3d 1109(A), 2007 WL 2004175, at *7 (Sup. Ct. N.Y. Cnty. 2007); *see also Deutsche Bank Sec.*, 7 N.Y.3d at 71 (personal jurisdiction in New York existed pursuant to CPLR 302(a)(1) over defendant based upon its dealings, primarily through an electronic messaging system with plaintiff's New York office, resulting in a significant bond sale, which was the subject of the litigation); *L & R Exploration Venture v. Grynberg*, 22 A.D.3d 221 (1st Dep't 2005), *lv denied* 6 N.Y.3d 749 (N.Y. 2005) (personal jurisdiction existed in New York pursuant to CPLR 302(a)(1) where a foreign domiciliary solicited significant amounts of money from New York investors by telephone and mail and visited with them in New York on several occasions to discuss the parties' joint venture).

*Humitech* is instructive because it establishes personal jurisdiction over Defendants on virtually identical facts. 2007 WL 2004175, at *7. There, the court found that a Texas defendant (Comu) CEO of a company purposefully transacted business in New York under CPLR 302(a)(1) based on, *inter alia*, soliciting the New York plaintiff to invest by telephone calls to New York, meeting with the plaintiff in New York to further convince him to invest, negotiated the loan through electronic communications with New York, and received money from a New York bank. *Id.* at *7-8. The court rejected Comu's attempt to characterize his New York meeting as merely a social "meet and greet" rather than substantive business negotiations, finding instead that he traveled to New York "in a further effort to convince [plaintiff] to invest." *Id.* at *7.

Here, the parallels are striking: Zaldivar and others at RSK and IOV, including Cobo, solicited Nerayoff by emails to New York (Am. Compl. ¶¶ 17-18), Zaldivar met with Nerayoff at the Bitcoin Conference in New York to induce investment (*id.* ¶¶ 20-21), negotiated the token purchases through communications directed to New York (*id.* ¶¶ 22-27), and New York-based Nerayoff ultimately sent bitcoin to a digital wallet controlled by IOV. (*Id.* ¶¶ 28-29.) Defendants cannot now recharacterize Zaldivar's in-person solicitation at the New York Bitcoin Conference as merely social when he specifically discussed the RIF token investment opportunity with Nerayoff. The *Humitech* court emphasized that modern technology enables business transactions without physical presence and that "courts have recognized that the evolution of modern technology has enabled business persons and professionals to transact business by electronic means, using telephones, fax machines and e-mail." *Id.* at *7. Just as the court in *Humitech* found jurisdiction over the Texas defendant who solicited investments from New York through a combination of in-person meetings and electronic communications, this Court should find that Defendants' coordinated solicitation campaign directed at New York, including Zaldivar's in-person meeting at the New York Bitcoin Conference, establishes purposeful transaction of business under CPLR § 302(a)(1).

> 2. Defendants Committed Tortious Acts in New York
> (CPLR § 302(a)(2)).

Zaldivar's in-person misrepresentations to Nerayoff at the New York Consensus Conference constitute tortious acts committed while physically present in New York. *Bialek v. Racal-Milgo, Inc.*, 545 F. Supp. 25, 35 (S.D.N.Y. 1982) (defendant's misrepresentations during interview in New York "clearly . . . sufficient to establish that defendant performed the injurious conduct in New York"). This is not a case of mere telephone communications. Zaldivar, who was

the CEO of RSK and Director of IOV, traveled to New York and made fraudulent statements to Nerayoff in person to induce his purchase of RIF tokens.

      3.   <u>Defendants' Out-of-State Acts Caused New York Injury (CPLR § 302(a)(3)).</u>

Section 302(a)(3)(ii) of New York's long-arm statute provides for personal jurisdiction where the defendant "commits a tortious act without the state causing injury to person or property within the state . . . if he expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." Defendants challenge the prong relating to the expectation of the injury in the state, arguing that such an injury was not foreseeable from their transaction with a Cayman entity. But as already addressed above, SDN was always owned and controlled by Nerayoff, and Defendants' communications and misrepresentations, including by both Zaldivar and Cobo, were directed at Nerayoff, causing injury in New York where Nerayoff resides and suffered his losses. Separately, Defendants made their representations before they became aware of the alleged ownership transfer – Defendants' misrepresentations (Am. Compl. ¶¶ 20-23) predate the MF Tax Group letter, dated May 23, 2018. (Ex. C.) Defendants should have reasonably expected their fraud to have consequences in New York. CPLR § 302(a)(3)(ii).

**B. Due Process Is Satisfied.**

To meet the due process requirements for personal jurisdiction, the defendant must have minimum contacts with the forum state and the maintenance of the suit must not offend traditional notions of fair play and substantial justice. *Trophy Depot,* 2016 WL 11509911, at *3 (citing *Asahi Metal Indus. Co. v. Cal. Super. Ct., Solano Cnty.*, 480 U.S. 102, 116 (1987)). Because Plaintiffs have demonstrated that Defendants have purposefully availed themselves of the privileges of doing business in New York, above, they have satisfied the minimum contacts prong.

"Where a plaintiff makes the threshold showing of the minimum contacts required for the first test, a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002). Defendants fail to meet their required burden of proof of the five "reasonableness" factors articulated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). They do not allege that litigating in New York would substantially burden them – because it would not (factor 1); or that New York does not have an interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors – because it does (factor 2); or that Plaintiffs do not have an interest in obtaining relief in New York, where Nerayoff resides – because they do (factor 3). All of those factors weigh in Plaintiffs' favor, and the exercise of personal jurisdiction over Defendants does not offend notions of fair play and substantial justice. *Trophy Depot*, 2016 WL 11509911, at *4.

Defendants' invocation on the forum selection clause in the ECA, to which Plaintiffs are not signatories, does not weigh in favor of any of the factors. Similarly, he argument that they deliberately avoided U.S. persons and listed the U.S. as a "prohibited jurisdiction" demonstrates their awareness of potential liability, not immunity from jurisdiction. In fact, they did ultimately solicit and accept investments traceable to at least one U.S. person (Nerayoff), whether directly or through the SDN structure they now claim was foreign-owned.

### C. Forum Non Conveniens Does Not Warrant Dismissal.

Defendants' *forum non conveniens* argument fails: it relies entirely on a forum selection clause in a document that neither Plaintiff signed.

1. <u>Neither Plaintiff Signed the ECA.</u>

Defendants' argument that the ECA's Gibraltar forum selection clause divests this Court of jurisdiction fails because neither Nerayoff nor SDN Limited signed the ECA. Nerayoff categorically denies: (1) signing any agreement with Defendants; (2) transferring SDN ownership to anyone; and (3) authorizing anyone to sign agreements on SDN's behalf. (Nerayoff Decl. ¶¶ 2, 7-8.) The document Defendants proffer bears the signature of "Yury Smolyar," not Plaintiffs. A forum selection clause in the ECA cannot deprive a court of personal jurisdiction over claims brought by non-parties to the agreement – "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson–CSF*, 64 F.3d at 776 (quoting *United Steelworkers*, 363 U.S. at 582 (1960)).

Defendants' reliance on the three-factor test from *Rabinowitz v. Kelman*, 75 F.4th 73, 81 (2d Cir. 2023), undermines their position. The first factor, whether the clause was "reasonably communicated to the party resisting enforcement," cannot be satisfied when Plaintiffs never received, reviewed, or signed the ECA. Defendants' claim that SDN "represented and warranted 'hav[ing] read and understood'" the ECA is false; the document bears Smolyar's signature, not any representative of Plaintiffs.

Defendants' attempt to bind Nerayoff as SDN's "personal representative" under the ECA fails because: (1) Nerayoff denies any transfer of SDN ownership; (2) he never authorized anyone to sign agreements on SDN's behalf; and (3) the fraud claims arise from pre-contractual misrepresentations, not from the ECA itself. Unlike *KTV Media Int'l, Inc. v. Galaxy Grp.*, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011), where the non-signatory was seeking to enforce contractual rights, Plaintiffs here assert claims based on misrepresentations that induced the investment, and those claims exist independent of any subsequent contract.

2.  <u>The Alleged "Transfer" of SDN Ownership Is a Fabrication.</u>

Defendants' argument that their misrepresentations to Nerayoff did not induce Plaintiffs' RIF token purchases because Nerayoff had previously transferred SDN to Smolyar is wrong. Nerayoff has always been and remains the sole owner of SDN. (Am. Compl. ¶ 3; Nerayoff Decl. ¶ 6.) The Feldman declaration Defendants cite actually undermines their position because it shows, at best, that Nerayoff sought Feldman's advice to address Defendants' concerns about dealing with U.S. persons, and not that any actual transfer occurred. If Defendants were deceived by Feldman's letter about SDN's ownership, in the absence of (1) Nerayoff's representations to Defendants that either MF Tax or Feldman acted on his behalf or (2) documentation showing actual ownership transfer, that is a consequence of their own lack of diligence, and not a basis for defeating jurisdiction.

Because Defendants' sole argument against litigating in New York is the forum selection clause in the ECA, which cannot bind nonsignatory Plaintiffs, the motion to dismiss based on *forum non conveniens* should be denied.

## III.  THE AMENDED COMPLAINT STATES VIABLE CLAIMS AND IS NOT FUTILE.

On a motion to dismiss under Rule 12(b)(6), the Court takes the complaint's factual allegations to be true and draws all reasonable inferences in the plaintiff's favor. *Nodify, Inc. v. Kristan*, No. 17-CV-2201, 2018 WL 11453931, at *1 (E.D.N.Y. Oct. 11, 2018) (citing *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009)).

Defendants' motion to dismiss under Rule 12(b)(6) should be denied. The Amended Complaint pleads fraud with the particularity required by Rule 9(b), alleges justifiable reliance notwithstanding the ECA's disclaimers, establishes loss causation, and properly states claims for

unjust enrichment and accounting. Contrary to Defendants' arguments, the amendments cure any deficiencies and are not futile.

### A.  The Fraud Claims Are Pleaded with Particularity Under Rule 9(b).

The Complaint properly pleads a fraud claim. To state a claim for fraud under New York law, a plaintiff must allege that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504 (S.D.N.Y. 2016). The Amended Complaint also satisfies Rule 9(b) by specifying: (1) the statements claimed to be fraudulent; (2) the speakers (Zaldivar and Cobo); (3) when and where the statements were made; and (4) why they were fraudulent. *Asdourian v. Konstantin*, 77 F. Supp. 2d 349, 353 (E.D.N.Y. 1999) (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172 (2d Cir. 1999)).

1.  <u>The Amended Complaint Identifies Specific Misrepresentations with Required Detail.</u>

The Amended Complaint amply alleges that Zaldivar made several false representations to Nerayoff, SDN's sole member, including on May 14-15, 2018, that the RIF blockchain was "fully functional" and poised for imminent expansion from promotion of the RIF operating systems protocols funded by the RIF token proceeds. (Am. Compl. ¶¶ 20-21.) Zaldivar also falsely claimed to Nerayoff "a strategic partnership in place with Bitclub" as well as "developers working on projects ready to launch on the RIF blockchain." (*Id*. ¶¶ 22, 38, 48.) In addition, in late May 2018, Cobo contacted Nerayoff in New York, falsely representing that the RIF blockchain was "a Bitcoin sidechain that provided Turing-complete smart contracts." (*Id.* ¶ 23.) These allegations specify the "who, what, when, where, and why" of the fraud. The Amended Complaint explains why each statement was false: the RIF blockchain lacked smart contract functionality on Bitcoin (*id.* ¶¶ 31-

32), no Bitclub partnership or projects ready to launch existed (*id.* ¶¶ 33, 38, 48), and funds would not be used for blockchain development or to market and promote the protocol and would instead be diverted to enrich Defendants. (*Id.* ¶¶ 34-35.)

Defendants mischaracterize concrete factual representations about existing capabilities as "forward-looking statements." When Zaldivar represented to Nerayoff in May 2018 that the blockchain was "live," "fully functional," and that RSK had a strategic partnership in place with Bitclub, he made statements about present facts, not future expectations. His representations that RSK would use token sale proceeds to market the RIF blockchain's expansion are likewise actionable. *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("a relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud"); *see also United States v. Schlisser*, No. 03-CR-611, 2004 WL 736900, at *1 (S.D.N.Y. Apr. 6, 2004) (untrue statements of material facts included statements regarding "proposed use of proceeds" from raised funds). Unlike aspirational statements about future development or success, addressed in cases Defendants cite, those false representations were about specific use of funds and current capabilities – not future goals.

## 2. The Misrepresentations Were Material.

Defendants cannot seriously dispute materiality. The fundamental capability of the blockchain, whether it actually provided smart contract functionality to Bitcoin as represented, goes to the heart of the investment opportunity. The existing strategic partnership with Bitclub and use of investor funds representations are likewise material. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 262 (2d Cir. 1993) (statements that misrepresented the status of ongoing strategic partnership discussions were materially misleading); *United States Sec. & Exch. Comm'n v.*

*Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 166 (S.D.N.Y. 2023) (statements about the use of investor funds for the company's "growth" were material misrepresentations); *Idrees v. Am. Univ. of the Caribbean*, 546 F. Supp. 1342 (S.D.N.Y. 1982) (defendant school's misrepresentations about its affiliation with hospital were material); *Beecher v. Able*, 374 F. Supp. 341, 346 (S.D.N.Y. 1974) ("statement as to the use of proceeds was a material misrepresentation"). The materiality of these misrepresentations is confirmed by Nerayoff's decision to invest thousands of bitcoin in RIF tokens, expecting significant returns once Defendants delivered on their strategic partnerships and used the funds raised from token sales develop and promote the RIF blockchain.[3] (Am. Compl. ¶¶28-29.)

### 3.  Plaintiffs Justifiably Relied on Defendants' Misrepresentations.

Plaintiffs allege that they justifiable relied on Defendants' misrepresentations, which were solely within the possession and knowledge of the Defendants. Defendants' arguments that a boilerplate integration clause in the ECA (which was not signed by Nerayoff) disclaims reliance and that Nerayoff, as a prominent cryptocurrency investor, should have known better are without merit.

---

[3] Defendants' characterization of the transaction as merely purchasing "utility tokens to consume services under the RIFOS protocols" (Mot. at 29) is disingenuous and contradicted by the parties' communications. The extensive solicitation of Nerayoff as a "strategic contributor" and "investor," and not a future user of network services, demonstrates the true nature of this transaction. Indeed, Defendants' own expressed concerns about selling to U.S. persons belies their current "utility token" narrative. If these were truly pre-purchases of network services rather than investments, Defendants would have had no regulatory concerns about U.S. purchasers. The reality, as Defendants well knew, was that Nerayoff and SDN were purchasing RIF tokens as investments with the expectation of appreciation in value, not to consume hypothetical future network services. *See* Compl. ¶¶ 17-18 (describing Defendants' solicitation of Nerayoff's "investment"); Mot. Ex. B (Defendants expressing regulatory concerns about U.S. investors).

*a.  The ECA Disclaimers Do Not Bar Fraud Claims.*

As an initial matter, Nerayoff did not sign the ECA, either personally or on behalf of SDN. Second, even if the ECA applied, while disclaimers may preclude claims based on prior representations in some circumstances, here, Plaintiffs are not barred from relying on Defendants' misrepresentations because Nerayoff did not negotiate the terms of the ECA at arm's length, or at all – unlike plaintiff in *United Artists Theatre Cir., Inc. v. Sun Plaza Enter. Corp.*, 352 F. Supp. 2d 342, 351 (E.D.N.Y. 2005), cited by Defendants – and the integration clause and disclaimers do not track the substance of the misrepresentations. *See Caiola v. Citibank, N.A.*, 295 F.3d 312, 330 (2d Cir. 2002) (citing *Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir.1993) (reciting rule that a valid disclaimer provision "must contain explicit disclaimers of the particular representations that form the basis" of the fraud claim)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp.*, 19 A.D.3d 273, 275 (1st Dep't 2005) ("[A] general merger clause such as that contained in the parties' agreement does not operate to bar parol evidence of fraud in the inducement; only where the parties expressly disclaim reliance on the particular misrepresentations is extrinsic evidence barred"); *LibertyPointe Bank v. 75 E. 125th St., LLC*, 95 A.D.3d 706, 706 (1st Dep't 2012) (merger clause that "makes no reference to the 'particular misrepresentations'" allegedly made does not bar fraud claim); *see also Healthwave Inc. v. New York Soc'y. for the Relief of the Ruptured & Crippled Maintaining the Hosp. for Special Surgery*, 99 A.D.3d 494, 494-95 (1st Dep't 2012) (misrepresentations of present intent not to perform are not negated by a general merger clause). The specific disclaimers in the ECA do not address the core misrepresentations here. The ECA contains no disclaimer stating that: (1) the blockchain might not actually provide smart contract functionality to Bitcoin; (2) claimed strategic partnerships might not exist; or (3) funds might be diverted for self-enrichment rather than development.

*b. Nerayoff's Sophistication Does Not Preclude Justifiable Reliance.*

While sophisticated investors must exercise due diligence, they may still justifiably rely on factual misrepresentations about matters "peculiarly within the defendant's knowledge." *Todd v. Pearl Woods, Inc.*, 20 A.D.2d 911, 911 (2d Dep't 1964), *aff'd*, 15 N.Y.2d 817 (N.Y. 1965). Whether a Bitclub partnership existed and how Defendants used investor funds were all matters within Defendants' exclusive knowledge. Similarly, that the RIF blockchain lacked smart contract functionality on the Bitcoin network became apparent only when RIF tokens were issued in November 2018 on Ethereum, and not on the Bitcoin network. (Am. Compl. ¶¶ 32, 42.) Even if, as Defendants claim, the information about the RIF's blockchain's functionality was publicly available ahead of the RIF token launch, Nerayoff's failure "to ascertain the truth by inspecting the public records is not fatal to [Plaintiffs'] action." *Todd*, 20 A.D.2d at 911.

*Rostami v. Open Props, Inc.*, No. 22-CV-3326, 2023 WL 137748, at *5 (S.D.N.Y. Jan. 9, 2023), cited by Defendants, is inapposite. There, the court found no reasonable reliance because defendants made only vague aspirational statements about building a "decentralized ecosystem" someday in promotional materials and plaintiff "was privy to multiple pieces of information that communicated the inherent risks" of the investment. *Id*. In contrast, here, Defendants made specific factual representations directly to Nerayoff that their blockchain was already "live," "fully functional," and currently providing smart contract capability to Bitcoin – present-tense misrepresentations about existing functionality, not future goals – to induce investment, as well as false claims about an existing Bitclub partnership and promises about fund usage that were contradicted by their subsequent self-dealing purchase of Taringa. Whether or not Nerayoff was a sophisticated cryptocurrency investor, in the absence of his privity to "multiple pieces of

27

information" that contradicted Defendants' misrepresentations, unlike plaintiff in *Rostami*, his reliance on those statements, made to him directly, was reasonable.

### 4. The Amended Complaint Adequately Alleges Fraudulent Intent.

Plaintiffs adequately plead Defendants' fraudulent intent because they plead facts "showing the defendant had the motive and opportunity to commit fraud, or alleging facts constituting circumstantial evidence of reckless or consciously fraudulent behavior." *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 352 (E.D.N.Y. 2008). A sufficient pleading of motive demonstrates the "concrete benefits" that a defendant could realize by the false statement or omission. *Id.* As detailed in the Amended Complaint, Defendants had both the opportunity and motive to commit fraud: Defendants knew at the time of their representations that the RIF blockchain lacked Bitcoin smart contract functionality, yet claimed it was "fully functional;" they knew that the strategic partnerships they touted did not exist and that investor funds would not be used to promote the RIF blockchain and develop its operating system protocol, yet made those misrepresentations to Nerayoff to induce his investment. (Am. Compl. ¶¶ 21-24.) Defendants ultimately revealed their true intent by diverting investor funds to enrich themselves and for matters unrelated to the RIF blockchain, such as the purchase of Taringa, an entity owned by the same founders as IOV, in a self-dealing transaction that enriched themselves at investors' expense. (*Id.* ¶¶ 32-35.) This subsequent conduct of using investor funds for self-enrichment, rather than the promised blockchain development, adequately supports scienter. *See Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) ("By alleging that Costco knew at the time of signing that it did not intend to abide by the contract and deceived Leadsinger into thinking that it would abide by the contract," plaintiff alleged scienter). Similarly, Defendants' "positive assertion of fact" regarding the blockchain's functionality and strategic partnership with Bitclub

to induce Nerayoff's purchase of RIF tokens constitute "strong circumstantial evidence of scienter." *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 123 (E.D.N.Y. 2011).

This case stands in stark contrast to *Rostami*, 2023 WL 137748 at *5, where the court found "entirely conclusory" allegations that defendants "never intended" to build their platform, because here Plaintiffs identify specific self-dealing conduct – the diversion of funds to purchase Taringa from IOV's own founders – that provides the evidence of fraudulent intent that was wholly absent in *Rostami*. *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 350 (S.D.N.Y. 2023) is likewise distinguishable. It involved forward-looking promises about platform security and monitoring that proved inadequate in practice, not present-tense factual misrepresentations about existing functionality that were false when made, whereas here, Defendants knew their blockchain lacked Bitcoin smart contract capabilities when they claimed it was "fully functional" and "live" on the Bitcoin network. *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) also defeats Defendants' argument: it requires allegations that defendants "knew of specific facts contrary to their public statements," which Plaintiffs satisfy by pleading that Defendants knew that their "fully functional" blockchain actually lacked Bitcoin smart contract capabilities.[4]

That Defendants directed purchases through third parties they selected and controlled (Am. Compl. ¶¶ 25-26) reinforces fraudulent intent because it shows a coordinated scheme where Defendants allocated tokens to intermediaries while maintaining control over the pre-sale process, as evidenced by Zaldivar personally "preserv[ing] allocation" for Plaintiffs. (*Id.* ¶ 27.) These structured transactions allowed Defendants to benefit from token sales while creating the false appearance of market demand and arms-length transactions.

---

[4] The Amended Complaint also alleges that Defendants knew that their statements about strategic partnerships, use of investor funds, and existence of developers were untrue when made. Am. Compl. ¶¶ 38-39, 48-49.)

5.  <u>The Amended Complaint Establishes Loss Causation.</u>

Plaintiffs adequately allege that Defendants' fraud caused their losses. The Amended Complaint alleges that after "the truth was exposed" upon the November 2018 launch, revealing that the RIF blockchain lacked Bitcoin smart contract functionality because the RIF token launched on Ethereum instead, Plaintiffs' investments "lost over 90% of their BTC value." (Am. Compl. ¶¶ 31-32, 36.) This is a "straightforward theory of corrective disclosure," where the disclosures contributed to the sudden decrease in value. *Crivellaro v. Singularity Future Tech. Ltd*., No. 22-CV-07499, 2024 WL 5146051, at *8 (E.D.N.Y. Dec. 17, 2024).

Defendants' argument that cryptocurrency market conditions and bitcoin's 37% decrease in value in November 2018 caused the loss ignores that *90% loss* cannot be attributed to general crypto market movements. Defendants cite *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 174 (2d Cir. 2005) for the proposition that "[w]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud decreases."[5] But the decrease due to market-wide phenomena does not eliminate causation where specific fraud is revealed. *Crivellaro*, 2024 WL 5146051, at *8 (finding loss causation based on theory of corrective disclosure even when bitcoin was declining in price and explaining that, "at the pleading stage, the Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible, even when it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of some market-wide phenomenon").

---

[5] In *Lentell*, the court found no loss causation because plaintiffs made "no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's . . . recommendations and no allegation that Merrill misstated or omitted risks that did lead to the loss." 396 F.3d at 175. Those facts are directly opposite because here, Plaintiffs have alleged both a negative reaction (RIF tokens' 90% loss of value) and Defendants' factual misrepresentations that lead to the loss (RIF blockchain's functionality).

6. <u>The Amended Complaint States a Claim for Aiding and Abetting Fraud.</u>

The Complaint properly pleads a claim for aiding and abetting fraud. To allege a claim for aiding and abetting fraud under New York law, the plaintiff must allege (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Carbon Inv. Partners, LLC v. Bressler*, No. 20-CV-3617, 2021 WL 3913526, at *7 (S.D.N.Y. Sept. 1, 2021). A plaintiff alleges "substantial assistance" where "a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed*." Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 443 (S.D.N.Y. 2017) (internal quotation marks omitted). As discussed earlier in this section, the Amended Complaint pleads each of these elements.

**B.  The Unjust Enrichment Claim Is Neither Duplicative Nor Barred.**

In seeking to dismiss the unjust enrichment claim, Defendants argue that this claim is (1) futile because the parties' relationship is governed by the ECA and (2) duplicative of Plaintiffs' fraud claims. This argument fails for numerous reasons.

1. <u>The Claim Is Not Barred by the ECA.</u>

First, Nerayoff's personal purchase of 2,800,000 tokens for 200 bitcoin (Am. Compl. ¶ 29(d)) and SDN's purchases from third parties directed by Defendants (*id.* ¶¶ 26-29) are not made pursuant to the ECA – Plaintiffs are not its signatories – permitting unjust enrichment claims for these transactions. *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc*., 749 F. Supp. 3d 456, 476 (S.D.N.Y. 2024) (denying dismissal of unjust enrichment claims by nonsignatory plaintiffs).

Defendants cite *Mueller v. Michael Janssen Gallery PTE. Ltd.*, 225 F. Supp. 3d 201, 208 (S.D.N.Y. 2016) to support barring claims by non-signatories, but there, the court dismissed an

unjust enrichment *against* (not by) a nonsignatory, who was expressly mentioned in the purchase agreement for artwork between a buyer and a gallery as an art advisor. The court predicated its reasoning on the existence of an agreement that governed the artwork purchase at issue, even though the defendant art advisor was not a party to it. *Id.* Here, in contract, there is no agreement to govern Plaintiffs' purchases of RIF tokens from Defendants. And even if Plaintiffs were signatories to the ECA, the "alleged retention of funds to which [defendants] were not entitled, is predicated on conduct not covered by the contract." *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 112 (1st Dep't 2005); *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012) (upholding unjust enrichment claim "predicated on conduct not covered by the contract" but rather "from defendants' misrepresentations"). Because the unjust enrichment claim is based on Defendants' misrepresentations and receipt of benefits through false pretenses, and those matters are not governed by the ECA, the ECA does not bar Plaintiffs' unjust enrichment claim.

## 2. Unjust Enrichment Is Properly Pleaded in the Alternative to the Fraud Claims.

Defendants' argument that Plaintiffs' unjust enrichment clams should be dismissed as duplicative of their fraud claim fails. Rule 8(a) provides that "relief in the alternative or different types of relief" may be demanded. Fed. R. Civ. P. 8(a)(3). Indeed, courts have routinely upheld the simultaneous pleading of unjust enrichment and fraud claims at the motion to dismiss stage because it is conceivable that plaintiffs could ultimately prevail under one theory but not the other. *See Allstate Ins. Co. v. Nazarov*, No. 11-CV-6187, 2015 WL 5774459 at *16 (E.D.N.Y. Sept. 30, 2015) (stating that unjust enrichment claims "based on the same facts as . . . claims for common law fraud" would be appropriate alternative claims to the plaintiffs' fraud claims had the plaintiffs failed to establish liability on the fraud claims); *see also In re Skat Tax Refund Scheme Litig.*, 356

F. Supp. 3d 300, 326 (S.D.N.Y. 2019) (denying dismissal of unjust enrichment claim pleaded in the alternative to fraud claim as premature); *Gov't Emps. Ins. Co. v. Badia*, No. 13-CV-1720, 2015 WL 1258218, at *16 (E.D.N.Y. Mar. 18, 2015) (order adopting report and recommendation, which stated that unjust enrichment claim is available "as an alternative to the conventional fraud claim").

### 3.  The Individual Defendants Were Directly Enriched

The Amended Complaint alleges that Defendants diverted investor funds to purchase Taringa, enriching individual Defendants Zaldivar and Cobo. (Am. Compl. ¶¶ 35, 72). This enrichment through self-dealing transactions satisfies the requirements for unjust enrichment against the individual defendants. Defendants' argument that the individual defendants were not directly enriched because Plaintiffs "do not allege transferring a single BTC to the Individual Defendants" fails under *Bayley v. Bethpage Federal Credit Union*, No. 21-CV-5821, 2024 WL 5105552, at *6-7 (E.D.N.Y. Dec. 13, 2024), which expressly rejected the identical argument. In *Bayley*, the court denied dismissal of unjust enrichment claims even though plaintiff never paid defendant Warrantech directly, instead paying a car dealership that then transferred funds to Warrantech. The court held that "New York law does not require 'some type of direct dealing or actual, substantive relationship with a defendant.'" *Id.* at *6 (quoting *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 311 (E.D.N.Y. 2017)). Here, the allegations are even stronger: Zaldivar and Cobo not only received funds indirectly through the entities they controlled, but actively diverted those funds to purchase Taringa in a self-dealing transaction that directly enriched them personally. (Am. Compl. ¶ 35.) As *Bayley* makes clear, at the motion to dismiss stage, Plaintiffs "need not prove [their] claim at this stage of the litigation, and will eventually be required to trace the allegedly fraudulent funds." 2024 WL 5105552 at *6. The individual defendants' personal participation in the fraud, combined with their ultimate receipt of benefits through the Taringa

acquisition, satisfies the "sufficiently close relationship" required for unjust enrichment under New York law.

### 4. The Constructive Trust Claim Is Not Futile.

Defendants' argument that the constructive trust claim must fail with the unjust enrichment claim collapses at both steps of its logic. First, Plaintiffs have properly pleaded unjust enrichment against all Defendants, including the individual defendants who personally participated in the fraud and benefited through the Taringa self-dealing transaction. Second, and independently fatal to Defendants' position, is their flawed premise that the ECA governs all claims and parties here. Defendants conveniently ignore that neither Nerayoff nor SDN are signatories to the ECA – a fact that undermines their contract-based defenses. Nerayoff's personal purchase of 2,800,000 tokens for 200 bitcoin directly from IOV (Am. Compl. ¶ 29(d)) occurred outside any written agreement, and SDN's purchases were directed through third parties selected by Defendants (*id.* ¶¶ 26-29), not through the ECA framework. The existence and scope of any contractual relationship between these parties remains hotly disputed.

A constructive trust is particularly warranted where, as here, Defendants obtained Plaintiffs' bitcoin through fraud and then diverted those funds to, *inter alia*, purchase Taringa in a self-dealing transaction. (Am. Compl. ¶ 35.) "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *In re Koreag, Controle et Revision S.A*., 961 F.2d 341, 353 (2d Cir. 1992). Plaintiffs have no adequate remedy at law to recover specific bitcoin or trace assets acquired with their funds, including Defendants' interest in Taringa, without the equitable remedy of a constructive trust. Because Plaintiffs have properly pleaded unjust enrichment, and because no

valid contract governs the relationship between all parties and all transactions at issue, Defendants' attempt to defeat the constructive trust claim fails as a matter of law.

### C. The Accounting Claim States a Valid Cause of Action.

In New York, if damages cannot be readily ascertained and the facts necessary to determine them are within the knowledge of the defendant, the plaintiff may assert a claim for an accounting based on three grounds: where a court finds that the transactions are complicated, a fiduciary or trust relation exists, or there is a need for discovery. *Uhlman v. New York Life Ins. Co*., 109 N.Y. 421, 433 (1888). An accounting is, therefore, proper where, as here: (1) the transactions are complex and involve commingled investor funds; (2) Defendants exclusively possess records showing how funds were used; (3) discovery is needed to trace bitcoin through multiple entities; and (4) a constructive trust remedy requires identifying specific assets. (Am. Compl. ¶¶ 82-84). *See Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 112-13 (Bankr. S.D.N.Y. 2016) (finding that accounting was necessary to ascertain damages); *Townsend v. John B. Carter Co*., 165 A.D. 973, 973 (1st Dep't 1914) (finding that the case would involve "long and complicated accounting" where the amount at issue was based on "a percentage of the profits to be derived from certain contracts"); *Harvey v. Sellers*, 115 F. 757, 759 (C.C.S.D.N.Y. 1902) (finding accounting of complicated character where it required calculating damages as a share of the profits). Defendants' arguments that the accounting claim is barred by the ECA and fails for lack of a fiduciary relationship are without merit.

#### 1. The Claim Is Not Barred by the ECA.

Defendants' premise that the ECA governs all claims and parties here is flawed. Neither Nerayoff nor SDN are signatories to the ECA. Nerayoff's personal purchase of 2,800,000 tokens for 200 bitcoin directly from IOV (Am. Compl. ¶ 29(d)) occurred outside any written agreement,

and SDN's purchases were directed through third parties selected by Defendants (*id.* ¶¶ 26-29), not through the ECA framework. The existence and scope of any contractual relationship between these parties remains hotly disputed. Even if ECA governed the parties' relationship, an accounting may be ordered despite any contractual relationship where the accounting claim is not merely duplicative of a breach of contract claim. *See Fourth Ave. Owners Corp. v. Douglas Elliman Prop. Mgmt.*, 234 A.D.3d 590, 591 (1st Dep't 2025) (permitting both contract and accounting claims).

### 2.  Fiduciary Relationship Exists.

A fiduciary relationship may arise where "one party's superior position or superior access to confidential information is so great as virtually to require the other party to repose trust and confidence in the first party." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 624 (S.D.N.Y. 2009). Whether the duty exists is a fact-specific inquiry. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 415 (S.D.N.Y. 2010) (citing *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank*, 261 F.R.D. 13, 26 (S.D.N.Y.2009), *aff'd.*, 382 Fed. App'x. 107 (2d Cir. 2010) ("New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because it usually involves a question of fact: whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence.")).

The Amended Complaint alleges a fiduciary or trust-like relationship arising from: (1) Defendants Zaldivar's and Cobo's superior knowledge and control over the development, functionality, and deployment of the RIF blockchain; (2) solicitation and control of pooled investor funds for a specific purpose; (3) express representations that funds would be used exclusively for blockchain development; (4) Plaintiffs' reliance on these representations; and (5) Defendants' exclusive control over fund usage. (Am. Compl. ¶¶ 6-7, 21-23, 77.) These allegations are adequate

to plead the "special knowledge and expertise" required for a fiduciary relationship beyond a mere commercial transaction. *See Anwar*, 728 F. Supp. 2d at 415.

3.  <u>An Accounting Is Warranted Even in the Absence of Fiduciary Relationship.</u>

Even in the absence of a fiduciary relationship, an accounting under New York law is warranted where "the consideration and adjudication of issues relat[e] to an account of a complicated character, *even in the absence of any element of mutuality or of trust relationship*." *Ball v. Soundview Composite Ltd. (In re Soundview Elite Ltd.)*, 543 B.R. 78, 123 (Bankr. S.D.N.Y. 2016) (emphasis in the original) (quoting 1 N.Y. JUR. 2D ACCOUNTS AND ACCOUNTING § 34). Thus, an accounting claim is "not to be foreclosed upon the narrow ground, urged by the defendant, that the . . . parties did not create a fiduciary relationship and that, therefore, the plaintiff is not entitled to an accounting." *Soundview Elite*, 543 B.R. at 122-23. (Citation omitted.)

Defendants do not dispute that the account of the bitcoin at issue here is of complicated character, nor could they. The "complicated" nature of bitcoin transfers is apparent because the transactions are numerous, complex, and span multiple entities controlled by Defendants, including Taringa; Defendants exclusively possess the information needed to trace the bitcoin and determine how investor funds were used; and the commingling of investor funds makes it impossible to track Plaintiffs' specific bitcoin without a full accounting. (Am. Compl. ¶¶ 82-83.) *Meghji v. Falba et al. (In re Celsius Network LLC)*, No. 22-AP-10964, 2025 WL 2211847, at *15 (Bankr. S.D.N.Y. Aug. 5, 2025) (declining to dismiss claim for accounting on the basis of the absence of a confidential or fiduciary relationship where cryptocurrency transactions at issue were of complicated nature). An accounting, therefore, is warranted and necessary.

### 4. Rule 8 Permits Alternative Pleading of Legal and Equitable Remedies.

Defendants' argument that Plaintiffs have an adequate legal remedy, precluding an accounting claim, misunderstands the procedural posture of this motion. At the motion to dismiss stage, Federal Rule of Civil Procedure 8(d)(2) expressly permits a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically," and Rule 8(a)(3) allows a demand for "relief in the alternative or different types of relief." Plaintiffs are not required to elect between remedies at the pleading stage.

Second, Defendants' argument ignores that an accounting serves a distinct purpose from damages claims. While Plaintiffs' fraud claims seek compensatory damages, the accounting claim seeks discovery of how Defendants actually used the 1,555 bitcoin collected from Plaintiffs – information exclusively within Defendants' control and necessary to trace assets for potential constructive trust relief. The complexity of tracing bitcoin through multiple entities controlled by Defendants, the commingling of investor funds, and the need to identify specific assets purchased with Plaintiffs' bitcoin (including the Taringa acquisition) demonstrate why legal damages alone are inadequate. *See Meghji v. Castel et al. (In re Celsius Network LLC)*, 669 B.R. 108, 123 (Bankr. S.D.N.Y. 2025) (accounting was proper, even where other causes of action provided legal remedy, where cryptocurrency asset transfers were of "complicated" nature). The fact that Plaintiffs also plead fraud claims does not provide them with "adequate legal remedy," particularly at the motion to dismiss stage. Plaintiffs are entitled to plead both legal and equitable theories of recovery.

5. <u>Defendants Cannot Avoid Accounting for Sales They Orchestrated Through Intermediaries.</u>

Defendants cannot escape accountability for transactions they orchestrated through third-party intermediaries. The allegations establish that these third parties functioned as Defendants' agents or controlled intermediaries in distributing RIF tokens.

First, Defendants maintained control over the distribution process: they advised Plaintiffs in the latter half of May 2018 that Plaintiffs' proposed purchase of RIF tokens should be made from certain non-parties, to which Defendants directed Plaintiffs. (Am. Compl. ¶ 26.) This was not a situation where Plaintiffs independently found sellers in an open market. To the contrary, Defendants specifically identified which third parties Plaintiffs should purchase from and directed Plaintiffs to those specific intermediaries.

Second, Defendants controlled the token allocation throughout this process. Zaldivar's text message that "I [Zaldivar] preserved allocation for you [Nerayoff]" (*id.* ¶ 27) demonstrates that Defendants maintained control over token distribution even when routing sales through intermediaries. These third parties could only sell tokens that Defendants had allocated to them for distribution. They were essentially conduits through which Defendants channeled their token sales while maintaining control over allocation and distribution.

These third parties functioned as Defendants' agents in their distribution scheme, receiving token allocations from Defendants and selling at Defendants' direction to investors Defendants had solicited. In any case, Defendants' use of intermediaries strengthens the need for an accounting because it demonstrates the complexity of tracking how investor funds flowed through their

distribution network. *Castel (In re Celsius Network LLC)*, 669 B.R. at 123 (accounting warranted where a crypto-asset at issue was transferred through multiple intermediaries).[6]

## IV.  PLAINTIFFS' CLAIMS ARE TIMELY.

As Defendants acknowledge, the filing of the summons with notice in New York state court on May 3, 2024, commenced this action for limitations purposes under CPLR 305(c). "[A]n action in Supreme Court is commenced by filing . . . summons with notice with the clerk of the court in the county in which action is brought" and "the claim is deemed interposed, for Statute of Limitations purposes, on the date of filing." *Luckern v. Lyonsdale Energy Ltd. P'ship*, 229 A.D.2d 249, 255 (4th Dep't 1997).

Defendants argue, incorrectly, that because Plaintiffs did not file the Complaint in *this* Court until November 5, 2024 (ECF 21), over 20 days from Defendants' demand for it on September 19, 2024 (ECF 8), CPLR 3012(b) mandates dismissal. This argument is without merit. While "CPLR 3012(b) provides that if the complaint is not served with the summons, service of the complaint shall be made within 20 days after service of a demand for a complaint," *JL Collier Corp. v. Wells Fargo Bank, N.A.*, 127 A.D.3d 1026, 1026-27 (2d Dep't), instead of demanding service of the complaint in state court – which would have started the 20-day clock to file the complaint – Defendants removed the case to this Court on August 30, 2024. (ECF 1.) Defendants argue, without support, that CPLR 3012(b) applies in this Court, but CPLR 3012(b) is a procedural rule that does not bind a federal court. *Stevens & Co., LLC v. Espat*, No. 24-CV-5223, 2024 WL 4593645, at *4 (S.D.N.Y. Oct. 28, 2024) (CPLR 3012(b) is not applicable in federal court because once a case has been removed to federal court, federal rather than state law governs the future

---

[6] *Trump v. Simon & Schuster, Inc*., 791 F. Supp. 3d 470, 508 (S.D.N.Y. 2025), cited by defendants, is inapposite because there, the accounting claim was pre-empted by the Copyright Act, and the court never addressed whether plaintiff otherwise stated the claim.

course of proceedings) (citing *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Co*., 415 US 423, 437 (1974)).

*Stevens* is instructive. There, the court rejected defendant's identical argument that a complaint filed in federal court 62 days after removal should be dismissed under CPLR 3012(b). 2024 WL 4593645, at *4. Like the defendant in *Stevens* who removed the case instead of demanding a complaint in state court (*id.* at *2), Defendants here chose the federal procedural framework and cannot now invoke state procedural rules to manufacture a statute of limitations defense. Because Plaintiffs initiated this action in May 2024 and timely filed their Complaint within a reasonable time after removal (*Stevens*, 2024 WL 4593645, at *4), their claims are timely.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion in its entirety.

Dated:     Brooklyn, New York
           November 21, 2025

Respectfully submitted,

/s/  *Ievgeniia P. Vatrenko*
Ievgeniia P. Vatrenko, Esq.
2 Northside Piers
Brooklyn, New York 11249
Tel: 718-451-6384
jenny@vatrenkoesq.com

*Attorney for Plaintiffs SDN Limited and Steven Nerayoff*